**MERCK & CO., INC., Plaintiff,**

v.

**DANBURY PHARMACAL, INC., Defendant.**

**Civ. A. No. 86–588 MMS.**

United States District Court, D. Delaware.

Aug. 31, 1988.

2

E. Norman Veasey, and Robert W. Whetzel, of Richards, Layton & Finger, Wilmington, Del., for plaintiff; Joseph M. Fitzpatrick, and Nicholas M. Cannella, of Fitzpatrick, Cella, Harper & Scinto, New York City, of counsel.

Jeffrey M. Weiner, Wilmington, Del., for defendant; Alfred B. Engelberg, Carmel, N.Y., of counsel.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

The plaintiff-patentee Merck & Co., Inc. ("Merck"), is a corporation organized and existing under the laws of New Jersey, with its principal place of business in Rahway, New Jersey. Pretrial Order, Dkt. 53, at 5 ("Pretrial Order"). The defendant Danbury Pharmacal, Inc. ("Danbury"), is a corporation organized and existing under the laws of Delaware, with its principal place of business in Danbury, Connecticut. *Id.*

On October 31, 1986, Danbury filed an abbreviated new drug application ("ANDA") with the Food and Drug Administration ("FDA") seeking permission to sell a generic version of the drug cyclobenzaprine. Cyclobenzaprine in hydrochloride form is marketed under the trade name FLEXERIL by Merck. Merck brought this action December 17, 1986, pursuant to 21 U.S.C. § 355(j)(4)(B)(iii) (Supp. IV 1987), charging Danbury with infringement of Merck's United States Patent No. 3,882,246 (the " '246 patent"). The '246 patent describes a method of use of cyclobenzaprine to treat certain types of skeletal muscle disorders. FLEXERIL is covered by the claims of the '246 patent.

Under 1984 amendments to the Patent Act, 35 U.S.C. § 271(e)(2) (Supp. IV 1987),[1] Danbury's ANDA certification that the '246 patent is invalid and unenforceable and notice to Merck of that certification constitutes infringement of the '246 patent. Approval of Danbury's application by the FDA is deferred pursuant to section 355(j) of the Food, Drug and Cosmetic Act while

---

1. Pub.L. No. 98–417, 98 Stat. 1603.

the validity and enforceability of the patent.[2]

The Court held a five day bench trial[3] from February 8 through 12, 1988. In view of the admitted infringement and Danbury's having not begun sales, the sole issues for determination at trial were the validity and enforceability of the patent. After trial, the parties submitted proposed findings of fact and conclusions of law and post-trial argument was held on August 9, 1988. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, based upon the testimony, documentary and live, including assessment of the demeanor of witnesses and positions presented at trial and the post-trial submissions.

Danbury seeks a declaration that the '246 patent is invalid for obviousness under 35 U.S.C. § 103 (1982 & Supp. IV 1987) ("section 103"), that the patent is unenforceable due to Merck's inequitable conduct before the Patent and Trademark Office ("PTO"), and that Merck is not entitled to the filing date claimed because of failure to adequately specify the invention in the initial application in accordance with 35 U.S.C. § 112 (1982) ("section 112").[4] The basis for Danbury's claim of obviousness is, briefly, that because "both cyclobenzaprine and amitriptyline were known in the prior art and ... a significant body of information was available with respect to their respective chemical, pharmacological and clinical properties," this prior art "would have taught a person skilled in the art that both cyclobenzaprine and amitriptyline were muscle relaxants." Defendant Danbury's Proposed Findings of Fact and conclusions of Law ("DFF") at 1.[5] Danbury also charges Merck with inequitable conduct, asserting that "no patent would have been granted but for the misrepresen-

tations and omissions with respect to the scope and content of the prior art and the nature and quality of the alleged invention" made during the prosecution of the patent. *Id.* Danbury's section 112 claims rests on the lack of an explicit statement in Merck's initial patent applications describing the invention's particular effect on muscle strength or coordination. Due to this lack of specificity, according to Danbury, the '246 patent fails under 35 U.S.C. § 102(b) (1982), because the claimed subject matter was published in the interim between the initial applications and the continuation-in-part application that led to the issuance of the patent.

Merck counters that the prior art publications cited by Danbury do not make the invention obvious, that Merck's omissions during the prosecution of the patent were immaterial and that no misrepresentations were made, and that the initial patent application described the invention sufficiently, satisfying section 112's requirements.

The Opinion is divided into two parts: findings of fact and conclusions of law. The areas covered in the first part will be: (a) Chemical Structures and Technical Terms; (b) The Development and Initial Testing of Cyclobenzaprine; (c) Synthesis and Early Work with Amitriptyline; (d) Prior Art; (e) Dr. Share's Work with Cyclobenzaprine; (f) Expanded Clinical Testing of Cyclobenzaprine; (g) Merck's Clinical Testing of Amitriptyline as a Muscle Relaxant; (h) Merck's FDA Submissions; (i) Prosecution of the '246 Patent; and (j) Cyclobenzaprine's Commercial Record. The second part of the Opinion will address the parties' legal theories and make conclusions law with regard to: (a) Burden of Proof; (b) Obviousness: 35 U.S.C. § 103; (c) Inequitable Conduct; (d) Section 112; and (e) Attorney Fees.

---

**2.** 21 U.S.C. § 355(j)(4)(B)(iii) (Supp. IV 1987).

**3.** This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1338(a) (1982), as well as 21 U.S.C. § 355(j)(4)(B) (Supp. IV 1987).

**4.** Danbury also requests attorney's fees under 35 U.S.C. § 285, alleging that this case is exceptional.

**5.** Because the parties' proposed findings of fact were particularly thorough, they have been helpful to the Court and are occasionally adopted, quoted or referenced. In referring to the proposed findings, however, the Court's intention is to memorialize their adoption, dependent on context, rather than rely on them as record authority.

**4**

## I. FINDINGS OF FACT

The FDA approved Merck's application to market cyclobenzaprine[6] under the trade name FLEXERIL in 1977.[7] The FDA limited its approval to use of FLEXERIL as "an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions." DX 10 at MF067603. FLEXERIL's FDA-approved dose is 10 milligrams three times daily, with a maximum dose of 60 milligrams per day. *Id.* at MF067604. In its ANDA, Danbury seeks approval to market a generic version of FLEXERIL at the same dosage and for the same purposes.[8]

Merck filed its initial patent application in Canada on July 7, 1970. *See* DX 79. The following year, Merck applied for a United States patent. DX 79. After submitting several amendments and two continuation-in-part applications, Merck's U.S. patent issued on May 6, 1975. PX 200.

### A. *Chemical Structures and Technical Terms*

Before embarking on the voyage through the record in this case, it is worthwhile to pause and ponder the various technical terms which will be encountered during the trip. The Court is hopeful that a somewhat prolonged detour now will avoid a plethora of definitions and explanations later.

Cyclobenzaprine, amitriptyline, and imipramine are all "tricyclic" compounds, that is, they share the same basic structure: comprising a central seven membered ring flanked on opposite sides by six-membered benzene rings. PX 307–310. There are thousands of tricyclic compounds that share this configuration. Engelhardt Tr. 639–643.

Amitriptyline differs from cyclobenzaprine in that there is a single carbon-carbon bond in amitriptyline at the 10,11 position, while cyclobenzaprine has a carbon-carbon double bond at the 10,11 position. Tr. at 645–50 (Engelhardt). The outer angles formed by atoms or molecules making up the three rings of the tricyclic compounds discussed here are numbered beginning at the upper point of the right benzene ring, as seen on a planar representation. As seen in planar representation, the 10,11 position corresponds to the horizontal segment at the top of the seven membered ring in the middle of the 6–7–6 tricyclics. Imipramine also has a single carbon-carbon bond at the 10,11 position. Tr. 645 (Engelhardt).

The presence of the double bond in cyclobenzaprine creates a rigidity in the molecule not found in amitriptyline; thus the two compounds have differing three-dimensional configurations, and two distinct isomers of cyclobenzaprine may be isolated at room temperature, whereas amitriptyline and imipramine molecules are too flexible to allow identification of separate isomers at room temperature. Tr. at 646–48 (Engelhardt).

Imipramine also differs from amitriptyline and cyclobenzaprine in the attachment of the side chain to the seven membered ring. In imipramine, the side chain is attached to the central ring through a carbon-nitrogen bond, which allows the side chain to rotate around the bond. In amitriptyline and cyclobenzaprine, a carbon-carbon double bond links the side chain to the central ring. As with the presence of the double bond at the 10, 11 position, the rigidity of the carbon-carbon double bond stiffens this portion of the molecule. Tr. at 648 (Engelhardt); PX 307–310.

Listed in the margin are several technical (chemical, pharmacological, or medical)

---

6. Cyclobenzaprine's formal chemical name is 3–(5H–dibenzo [*a,d*] cyclohepten–5–ylidene)–N, N-dimethyl-1-propanamine. Pretrial Order, ¶ 8, at 7. Since its development, Merck has referred to cyclobenzaprine as "MK–130" and as "Lisseril," among other names.

7. *See* Defendant Danbury's Proposed Findings of Fact and Conclusions of Law ("DFF") ¶ 41, at

29 (Dkt. 62); Defendant's Trial Exhibits ("DX") 104 (FDA FLEXERIL Approval Letter, June 15, 1977), 9 (Summary for Basis of Approval of FLEXERIL) and 10 (Approved FLEXERIL Label–1977).

8. Pretrial Order at 2.

terms that bear on the resolution of the instant claims. The definitions, except where noted, were agreed upon by the parties.[9]

9. *See* Court Exhibits ("CX") 1 and 2. CX 1 is a glossary of terms submitted by Merck. CX 2 is a counterglossary submitted by Danbury.

amitriptyline: a chemical compound having the following structure in planar representation

$$CHCH_2CH_2N(CH_3)_2$$

It is approved for sale as an antidepressant under the Merck tradename ELAVIL.

anticholinergic: the ability to antagonize or block the transmission of impulses from a variety of certain "cholinergic" nerves and the neurons or organs they supply (including muscles or glands) by blocking the effects of the neurotransmitter acetylcholine.

ataxia: loss of motor coordination

central action: commonly used to refer to actions within the central nervous system which consists of the brain and spinal cord

centrally-acting muscle relaxant: a sub-class of drugs used as skeletal muscle relaxants consisting of a diverse group of compounds thought to act in the central nervous system (i.e., the brain and spinal cord), as distinguished from drugs known to act peripherally on skeletal muscle itself, or on the nerve-muscle junction

chlorpromazine: a chemical compound approved for sale as a major tranquilizer. One of its tradenames is THORAZINE.

cyclobenzaprine: a chemical compound having the following structure in planar representation

$$CHCH_2CH_2N(CH_3)_2$$

It is approved for sale as a skeletal muscle relaxant under the tradename FLEXERIL. Besides "cyclobenzaprine," Merck identifies the compound variously as "MK–130," "Lisseril," and "M–27–67 [?]." In the literature, cyclobenzaprine is sometimes referred to as "proheptatriene."

desipramine: (desmethylimipramine)—a chemical compound approved for sale as an antidepressant. One of its tradenames is NORPRAMIN.

diazepam: a chemical compound approved for sale as an anti-anxiety agent and as a skeletal muscle relaxant. One of its tradenames is VALIUM.

dibenzocycloheptene: a tricyclic organic molecule having a central seven membered cyclic structure flanked on opposite sides by six membered benzene rings.

double blind study: a type of clinical trial where neither the patient nor the doctor knows whether the patient is receiving a test drug or a placebo.

hypertonic: abnormally increased or excessive muscle tone caused by sustained and persistent muscle contraction.

imipramine: a chemical compound approved for sale as an anti-depressant. One of its tradenames is TOFRANIL.

intracerebroventricular injection: a route of administration used in experimental animals performed by injecting a test solution into the fluid filled cavity inside the cerebrum of the brain called the lateral cerebral ventricle.

intraperitoneally: (i.p.) route of drug administration used extensively in experimental animals that involves the injection of a drug solution into the abdominal peritoneal cavity.

ischemia: deficiency of blood in a part of the body, usually brought about by constriction or occlusion of blood vessels.

linguomandibular reflex: tongue-jaw reflex. A transient opening of the mouth produced by brief electrical stimulation of the tongue.

mephenesin: a chemical compound that was the first widely studied so-called "centrally acting muscle relaxant," and is the fore-runner of that group of muscle relaxants.

muscle tone: Merck's definition of muscle tone is "the resistance of a muscle or muscle group to imposed stretch. Normal muscle tone is the activity of the muscle at rest or prior to activity. Danbury refused to accept that definition, offering instead the following: "the basal contraction of skeletal muscles at rest which maintain a state of readiness or posture of an extremity or other part of the body." The nuances between these two definitions have not affected the Court's analysis.

myoclonus: involuntary, irregular jerking of muscles.

neuromuscular blocking agent: an agent which blocks the transmission of impulses from the nerve to the skeletal muscle, thus resulting in an inability to move, i.e., paralysis.

neuron: a nerve cell.

patellar reflex: knee jerk reflex elicited by tapping the patellar tendon producing a brief stretch of the muscle followed by the brief reflex muscle contraction.

peripheral action: commonly used to denote action taking place outside the central nervous system

pharmacology: the study of the actions of chemical substances, such as drugs, on biological systems.

phasic muscle activity: brief, short lasting activity (i.e., on the matter of a few seconds or less; for example the knee jerk reflex); as contrasted with *tonic activity* which would be sustained over a significantly longer period.

**6**

### B. *The Development and Initial Testing of Cyclobenzaprine*

In 1956, as part of Merck's Mental Health Program, an employee of Merck, Dr. Edward L. Engelhardt and a Merck consultant, Dr. Arthur C. Cope, synthesized the tricyclic compound [10] cyclobenzaprine.[11] Drs. Engelhardt and Cope developed a number of compounds for study as possible tranquilizers. Plaintiff's Trial Ex-

rigidity: here too the parties disagree on the proper definition. However, as was the case with muscle tone, the subtle distinctions between the parties' proffered definitions have not materially affected the Court's analysis. Merck's definition reads: "a condition characterized by increased resistance to passive movement which is relatively constant throughout the range of motion of the limb. Muscle rigidity often occurs in Parkinson's disease." Danbury prefers the following: "[a] condition ... characterized by increased resistance to passive movement which is constant throughout the range of motion of the limb. It involves both flexors and extensors, but often one is more severely involved than the other. It occurs in Parkinson's Disease and diffuse encephalopathy due to toxic, metabolic, anoxic, or ischemic etiologies."

single blind study: a type of clinical trial where the patient does not know whether he or she is receiving a drug or placebo, however, the doctor conducting the study does know.

skeletal muscle: striated muscle associated with voluntary movements of the body such as the joints and limbs. It is to be distinguished from (i) smooth, involuntary muscles (such as those in the gastrointestinal tract) and (ii) cardiac muscle.

skeletal muscle hypertonic activity: a condition of excessive tone of skeletal muscles, caused by the sustained, greater than normal, activation of a skeletal muscle; distinct from hyperphasic activity.

smooth muscle: involuntary muscles such as those associated with the gastro-intestinal tract.

spasm: The parties have failed to agree upon a definition of spasm. Merck suggests that spasm be defined as "sustained involuntary muscle contraction accompanied by muscle shortening and electrical activity, usually sporadic and recurrent. Muscle spasm or splinting is generally observed after direct trauma or injury to the muscle tendons, or bones, and appears to be part of protective responses by the body. Muscle spasm also frequently occurs in lower back injury." Danbury's definition reads: "This condition results from a response to sensory irritation, usually pain. It is a sustained involuntary contraction accompanied by muscle shortening and electrical activity. Muscle spasm or splinting usually follows direct trauma to muscle, and appears as protective splinting in low back and cervical spine syndromes, many orthopedic deformities, acute and subacute arthritic states, myositis, and muscle contraction head-ache." Again, the difference in definitions does not affect the outcome.

spasticity: In Merck's view, spasticity refers to "conditions resulting from a number of different disease syndromes, such as spinal cord or cerebral injury; cerebral vascular accident, multiple sclerosis or cerebral palsy. It is characterized by an exaggerated response of the muscle to stretch and elongation—i.e., exaggerated stretch reflexes. Spasticity occurs because of interference with the normal coordinated contraction—relaxation balance among different muscle groups." Danbury rejects this definition, offering instead the following: "this condition is characterized by increased muscle resistance to passive stretch which depends upon the integrity of the dorsal roots. It is characterized by exaggerated deep tendon reflexes, an enlargement of the reflex sensitive area, and the 'clasp knife' phenomenon, in which the resistance to passive movement melts away with progressive stretching. In man, it is evident in the 'anti-gravity' muscles, the arm flexors and leg extensors. Spasticity arises secondary to lesions of the central nervous system in such disorders as stroke, cerebral palsy, multiple sclerosis, brain or spinal cord injury, tumor, abscess, thrombosis, or embolus." Because of the Court's disposition, there is no need to resolve the discrepancy between the offered definitions.

splinting: a protective mechanism; an attempt by the skeletal muscles to prevent movement of an injured area to reduce pain after a trauma or local injury.

systemic: refers to actions or administration potentially affecting the entire body, as in "systemic administration" of a drug by routes such as intravenous or oral thus resulting in the potential distribution of the drug to all body systems via the circulation.

**10.** Tricyclic compounds are molecules containing three rings of atoms. *See* Hackh's Chemical Dictionary at 867 (3d ed. 1944). For the purposes of this decision, tricyclic compounds mean only tricyclic compounds of the 6–7–6 family, i.e., compounds composed of three rings, two outer rings of benzene surrounding the inner seven membered ring (also referred to as dibenzocycloheptanes). *See* Tr. at 642 (Engelhardt).

**11.** Proposed Findings of Fact and Conclusions of Law of Plaintiff Merck & Co., Inc. ("MFF") ¶ 16, at 6–7. Cyclobenzaprine was the subject of an earlier patent (No. 3,454,643) which has now expired.

hibit ("PX") 202; Trial Transcript ("Tr.") at 603 (Engelhardt).[12] Cyclobenzaprine was among the resulting compounds tested; it demonstrated activity in animal tests used to predict tranquilizing activity in humans. Tr. at 604 (Engelhardt).

During 1957 and 1958, cyclobenzaprine was the subject of a battery of tests, including tests for atropine-like activity. Tr. at 604–07 (Engelhardt); DX 21; MFF ¶ 17. Atropine-like or anticholinergic activity refers to the resemblance of a compound's activity to that of atropine, an antispasmodic agent widely used at the time in treating Parkinson's disease patients. DX 32 at 285; PX 287, 292. Anticholinergic or atropine-like activity describes the action of a substance in "antagoniz[ing] or block[ing] the transmission of impulses from a variety of certain 'cholinergic' nerves and the neurons or organs they supply (including muscles or glands) by blocking the effects of the neurotransmitter acetylcholine." Court Exhibit ("CX") 1 at 1 (Glossary of Technical Terms). As Dr. Melvin Van Woert, defendant's expert witness, explained more fully at trial:

A. [Anticholinergic action is] action ... to block the communication between two nerve cells that require acetylcholine, a neurotransmitter.... Acetylcholine is necessary for one nerve cell to communicate with another in a particular area of the brain, not all areas, but in that particular area of the brain. It is extremely important in the area of the brain where the pathology of Parkinson's disease occurs.

Q. What is the effect of an anticholinergic action with respect to Parkinson?

A. It blocks—let's call it a Parkinsonian area of the brain.... It blocks the cholinergic transaction. The action of acetylcholine at that particular spot, it's an anticholinergic, acts against that cholinergic. By acting against it it reduces the symptoms of Parkinson's disease.

Q. What effect does that have on muscle tone?

A. It reduces muscle tone in the Parkinson patient.

Tr. at 178–79 (Van Woert).

The tests were summarized in a Merck report denoted "MK–130 Preclinical Evaluation" (the "preclinical evaluation") dated Feb. 10, 1958 (DX 21). Some of the tests were used to measure muscle relaxant activity, but cyclobenzaprine did not display any muscle relaxant activity under the tests employed. Tr. at 606 (Engelhardt); MFF ¶ 18. Cyclobenzaprine did display, however, "considerable ataraxic (tranquilizing) activity in animals." DFF ¶ 2 at 3; DX 21 at MF015534. "In all species that ataraxic effect was manifested by a unique hypnotic or sedative action, which, unlike barbiturates and other depressants, was not accompanied by predepression excitement, appreciable ataxia or other evidence of motor deficit." *Id.*

Cyclobenzaprine also displayed anticholinergic activity:

It is anticipated that the atropine-like activity of MK–130 may prevent the appearance of Parkinsonian-like tremors, which is emerging as a characteristic side effect of the more potent phenothiazine-type tranquilizing drugs in man. This concept is based upon the fact that Parkinsonian tremor in its natural form or produced by tranquilizing agents in man is most effectively treated by agents possessing atropine-like activity.... Such considerations strongly suggest that the atropine-like action of MK–130 may represent a useful ancillary activity to its basic tranquilizing properties.

DX 21 at MF015550.

The preclinical evaluation led Merck to conduct clinical investigations of cyclobenzaprine's tranquilizing and antidepressant activities in man. Tr. at 752–53 (Strickland); DX 78 at MF102579; MFF ¶ 19.

12. Dr. Engelhardt, who holds a doctorate in chemistry, worked in various capacities for Merck: after his work on tranquilizers in the 1950s, he became Assistant Director of Merck's Medicinal Chemistry Department. He is now a Merck Distinguished Senior Scientist. Tr. at 600–01.

While cyclobenzaprine showed some tranquilizing activity, its activity was no better than known tranquilizers. Cyclobenzaprine also showed some antidepressant activity, but produced a number of undesirable side effects. DX 78 at MF102579.

The results of the clinical probes were included in Merck's Revised Clinical Operational Plan, dated Oct. 5, 1970 (DX 62). "In 1958–59, in open clinical trials involving 12 investigators and 294 patients, MK–130 was shown to have some activity in the treatment of depressive states.... Although the drug was also shown to have antipsychotic activity, these preliminary studies did not show it to offer any advantage over the standard effective ... [tranquilizers]." DX 62 at MF001634. After experimenting with cyclobenzaprine as a veterinary tranquilizer, which yielded some positive results, but not at a level making cyclobenzaprine superior to other available drugs, testing on cyclobenzaprine was halted around 1960. Tr. at 619–20 (Engelhardt); DX 19 at MF093046–47; MFF ¶ 21.

### C. *Synthesis and Early Work with Amitriptyline*

Dr. Engelhardt also synthesized amitriptyline, as part of the same Merck Mental Health Program. Tr. at 620 (Engelhardt); MFF ¶ 22. According to Merck, "amitriptyline was put through the same battery of tests used to evaluate cyclobenzaprine, and Merck concluded it was inactive as a tranquilizer." Tr. at 620 (Engelhardt); MFF ¶ 23. When Dr. Engelhardt learned in May 1958 that the chemically related compound imipramine had shown clinically useful antidepressant activity, he advocated that Merck clinically evaluate amitriptyline as an antidepressant. Tr. at 620–22 (Engelhardt); DX 7 (*In re Merck*, No. 85–2740 (Fed.Cir.) (Joint Appendix)).

Amitriptyline was clinically tested, and the tests demonstrated its clinical efficacy as an antidepressant. The FDA approved the drug for this use in 1961. Merck marketed it under the trade name ELAVIL beginning in that year and continuing until the present. Tr. at 621–22 (Engelhardt).

### D. *Prior Art*

There are two lessons plain in the prior art collected by Danbury: (1) amitriptyline's (and to a lesser extent cyclobenzaprine's) possible usefulness as a muscle relaxant was known; and (2) amitriptyline and cyclobenzaprine share, to differing degrees, similar pharmacological properties. Danbury seeks to draw from the two lessons the conclusion that cyclobenzaprine's muscle relaxant activity [13] was obvious and that therefore Merck is not entitled to its patent. The soundness of that conclusion is examined in the Court's conclusions of law, section II, part B, of this Opinion.

#### 1. Amitriptyline's Usefulness as a Muscle Relaxant

The first lesson taught by the prior art concerning the pharmacological properties of amitriptyline is that, in addition to its established use as an antidepressant, the compound exhibited significant activity as a muscle relaxant. Merck disputes this, relying mainly on the fact that amitriptyline's accepted use was in the area of antidepressant activity and that given its years of use in treating depression, one would have expected amitriptyline's muscle relaxant activity to have surfaced. Danbury's response is twofold. First, Danbury argues that amitriptyline's track record as an antidepressant is consistent with its muscle relaxant activity, because depressed patients frequently exhibit increased muscle tone, some of amitriptyline's effectiveness in treating depression may be attributed to its muscle relaxant activity. Second, Danbury asserts that the nonclinical prior art contains explicit references to amitriptyline's utility as a muscle relaxant. A careful review of the prior art evidence and the testimony at trial convinces the Court that amitriptyline did show activity as a muscle

---

**13.** Merck's strongest response to Danbury's prior art argument is that cyclobenzaprine's selectivity is not taught anywhere in the prior art. Although Danbury does not contend that the prior art discloses cyclobenzaprine's selective action on hypertonic muscle, Danbury disputes cyclobenzaprine's selectivity. It is precisely this selectivity which formed the primary basis for grant of the patent.

relaxant and that Merck knew of this activity. However, as will be explored later, the conclusion that amitriptyline was a known useful muscle relaxant does not lead automatically to the ultimate conclusion that use of cyclobenzaprine as a *selective* muscle relaxant was obvious for the purposes of 35 U.S.C. § 103.

Three categories of prior art publications form the bedrock of the lesson that amitriptyline displays muscle relaxant activity: (i) the mid–1960s publications by Sinha et al; (ii) the Lance work on tension headache; and (iii) the use of amitriptyline and other anticholinergics in the treatment of Parkinson's disease. Taken together with an eye toward their impact at the time, these references strongly indicate amitriptyline's effectiveness as a muscle relaxant.

■ *(i) The Sinha publications:* Sinha and his colleagues published three articles in 1965 and 1966. Two were published in the Japan Journal of Pharmacology, and the third appeared in Arch. int. Pharmacodyn. DX 39, 40, 41. The articles disclose that imipramine, amitriptyline, and desipramine display muscle relaxant activity in animal tests:

> Our studies clearly demonstrate the potent central muscle relaxant activity of imipramine, desmethyl-imipramine and amitriptyline. Increased muscle tone is a common accompaniment of reserpine syndrome and is consistently present in patients of depressive psychosis. These agents antagonize the increased motor activity induced by reserpine. Clinically, they are effective antidepressants. In view of the increased muscle tone in depressive states and the effective central muscle relaxant property of these agents, it seems probable that this property of these agents might be playing some role in their antidepressant action. A controlled clinical trial of imipramine and its congeners as central muscle relaxants in certain spastic musclar [sic] disorders seems warranted.

DX 39 at 256 (16 Jap.J.Pharm. 250, 256 (1966)).

A great deal of time at trial was directed to the validity and reliability of the Sinha publications. Merck identified several supposed flaws in Sinha's methodology, and argues now that "[a]s a result of these and other deficiencies, the Sinha articles" are immaterial. Post–Trial Brief of Plaintiff Merck & Co., Inc., Dkt. 64, at 35. Smith, the plaintiff's expert, claimed that those skilled in the art would have disregarded Sinha because of these flaws. Tr. at 842–55 (Smith). Share testified that he did disregard Sinha. Tr. at 446 (Share). On the other hand the defendant's expert, Van Woert, felt that the tests conducted by Sinha, contrary to the Merck expert testimony, were supportive of the conclusions drawn; i.e., that the three compounds demonstrated muscle relaxant activity. Tr. at 162 (Van Woert).

The Court finds it unnecessary to resolve the conflict on Sinha's methods because there is ample evidence that, regardless of their hindsight critique, Merck personnel were influenced by the Sinha publications at the time. For example, the initial selection of cyclobenzaprine resulted from a decision by Dr. Gleason, the Merck chemist in charge of the muscle relaxant program, to request from Merck's sample collection compounds "related to amitriptyline." DX 48. This request came in the form of a memorandum dated January 25, 196[7] [14]:

> Results of the Veratramine Test on amitriptyline and recent report on central muscle relaxant activity of amitriptyline (Sinha et al, Jap.J.Pharmacol. 16:250, 1965) suggest submission of analogues to our muscle relaxant screen.
>
> Could you please let me known what compounds are available in your sample library related to amitriptyline, protriptyline, cyproheptadine, etc. . . .

DX 48 at MF000929. Cyclobenzaprine was one of the first twenty-three compounds selected for the screen as a result of the Gleason memorandum. DX 49, 50; Tr. at

---

14. Although the date on the memorandum is January 25, 1966, Merck concedes that this was a typographical error. Tr. at 310.

311–12. The memorandum gives no indication that Sinha's methods struck Gleason as suspect. To the contrary, the memorandum corroborates Danbury's position that the technical deficiencies Merck now finds in Sinha are at least partially litigation-inspired.

Additionally, Engelhardt cites Sinha in a chapter on muscle relaxants in a 1970 book. DX 89. Although he does not recall the substance of the conversation, Engelhardt testified that he discussed the Sinha article with Share before including it in the chapter. Tr. at 692–95 (Engelhardt).

A further indication of the reliance placed on Sinha during the muscle relaxant research is the Rooney note. Dr. Rooney took over Gleason's position as the chemist in charge of the muscle relaxant program in 1968. He wrote an undated note on a copy of the Sinha article:

This is literature art which might be quoted against patent applications in the tricyclic series for muscle relaxation. Fortunately, cyclobenzaprine is not mentioned.

DX 95. The reference to "patent applications" suggests that the note dates from sometime after Merck seriously contemplated or had applied for what would mature into the '246 patent.

Finally, during an October 1970 meeting regarding the development of cyclobenzaprine and amitriptyline as muscle relaxants the Sinha article was noted. The minutes of the meeting contain the following observation:

It was pointed out that a publication in the Japanese Journal of Pharmacology several years ago, which claimed that amitriptyline has muscle relaxant properties will probably preclude obtaining use patent on this compound.

DX 57 at MF093716. Arther, Merck's patent attorney, did not attend the October meeting, but later opined that no patent could be obtained for amitriptyline as a muscle relaxant due to the Sinha articles. DX 88.

The Court agrees with Danbury that the foregoing references do not display any detectable criticism of Sinha's methods or conclusions. Rather, the references strongly suggest that the Sinha articles were taken seriously by the personnel involved in the muscle relaxant program at the time, and that those personnel accepted that amitriptyline might have potential as a muscle relaxant.

(ii) the Lance work on tension headache: An article published by Lance in 1964 found amitriptyline's effect on patients suffering from tension headache "highly significant." DX 34 at MF089759. Lance opens the article with the statement that "[a] constant factor in the production of tension headache appears to be inability of the patient to relax the muscles of the face, scalp, and neck." Id. at MF089757. He describes analyzing amitriptyline's favorable effects on patients for evidence of "any clinical pattern [that] could lead one to predict success of failure for this treatment in any particular patient." The results were surprising:

The majority of patients gave no indication of being depressed, and "depressive symptoms" noted in the [results] were minor. A cross-section of patients was examined by one of our colleagues from the department of psychiatry ... who made an estimate of depression on the Hamilton rating scale.... There was no evidence that amitriptyline influenced selectively those patients who had some degree of depression.

Id. at MF089760. Lance's results answer Merck's assertions that tension headache results are not relevant because of the incidence of depression in tension headache and that tension headache does not reveal anything useful about muscle relaxant activity. Depression may be related to tension headache; however, Lance's results indicate that amitriptyline's activity in tension headache is not limited to its antidepressant action.[15]

---

15. Lance's conclusions are buttressed by anecdotal work involving the use of amitriptyline to treat whiplash, cervical pain, and related disorders. DX 37, 38 (articles by Ellerbroek and Dalessio).

Moreover, Merck's own treatment of tension headache in the past belies its current position. Merck sponsored a second tension headache study by Lance, the results of which were reported by March 1972. DX 68 at MF001776. The second study focused on the activity of cyclobenzaprine in treating tension headache and found "[cyclobenzaprine] comparable in its efficacy with ... amitriptyline." *Id.* Share cited Lance's work in a 1975 publication in support of the assertion of cyclobenzaprine's efficacy in treating hypertonic muscle disorders. DX 99 at MF004764J. Additionally, Smith stated in his 1965 treatise that sustained muscle contractions are symptomatic of tension headaches.[16] DX 36 at 2.

The Court finds that Merck knew of amitriptyline's muscle relaxant activity in the treatment of tension headaches.

*(iii) the use of amitriptyline and other anticholinergics in the treatment of Parkinson's disease:* Danbury also characterizes as material prior art describing amitriptyline's usefulness in treating the muscle rigidity and tremor associated with Parkinson's Disease. DX 31, 32, 33; Tr. at 176–202 (Van Woert).

The utility of amitriptyline and the other tricyclic antidepressant compounds for this purpose was attributed to their anticholinergic activity. Cyclobenzaprine was known to be a more potent anticholinergic agent than amitriptyline both as a result of Merck's pre–1960 clinical evaluation of that compound ... and the Metys publication.... The expectation that cyclobenzaprine would be effective against Parkinsonian tremor and rigidity was first expressed by Merck in its 1958

Pre-clinical Evaluation and that expectation is reinforced by the clinical use of amitriptyline and imipramine in the treatment of Parkinson's disease during the 1960's.

DFF ¶ 21. Merck's responds that anticholinergic activity is not the equivalent of muscle relaxant activity, and adds that the complexities of Parkinson's disease defeat Danbury's attempt to draw the inference that anticholinergics would be expected to indicate muscle relaxant action. On this point, the two sides apparently differ, because Van Woert testified that the use of anticholinergics resulted in a reduction of muscle tone in Parkinson's patients.[17]

Weighing both sides, it appears that drugs displaying some usefulness in treating Parkinson's would be likely candidates for testing for muscle relaxant activity. Anticholinergics were one class of compounds tested by Share in the veratramine screen he developed as part of his initial research.[18] However, Danbury does not argue that the evidence of amitriptyline's (and cyclobenzaprine's) anticholinergic activity portends *selective* action on hypertonic muscle. For that matter, neither the tension headache evidence nor the Sinha studies suggest any kind of selective action, i.e., action reducing abnormal muscle tone without affecting normal muscle tone.

2. Amitriptyline and Cyclobenzaprine Share Similar Pharmacological Properties

The prior art also reveals that amitriptyline and cyclobenzaprine, contrary to Merck's general position, share similar pharmacological properties.[19] Several pri-

---

**16.** The Court finds Smith's testimony concerning the lack of proof of increased muscle activity in connection with tension headache convincingly contradicted by the Lance article and by Share's reliance on Lance, but most significantly by Smith's statement in his 1965 article that "[t]he interest in compounds with muscle relaxing properties is concerned primarily with discovering better means of inhibiting unwanted or excessive skeletal muscle activity, for example ... to reduce the local sustained muscle contractions ... such as occur in tension headaches." DX 36 at 2.

**17.** *See* Tr. at 179 (Van Woert).

**18.** *See infra* at page 13 n. 21.

**19.** What is unclear is whether cyclobenzaprine and amitriptyline have selectivity in common. Merck maintains that cyclobenzaprine is unique in its selectivity. However, in Share's June 1970 report, he states:

Comparative studies with amitriptyline, chlorpromazine and diazepam indicate that while amitriptyline is approximately equipotent, both chlorpromazine and diazepam are considerably more potent than MK–130 in [the MEPRIA screen] (Table 1). However, both chlorpromazine and diazepam exhibited

or art publications teach that amitriptyline and cyclobenzaprine behave similarly in a variety of tests. Although the two compounds display a differing degree of potency, the evidence supporting similarities is substantial.

Initially it is noteworthy that, according to Merck's own published work, compounds which differed only by the presence or absence of a double bond were routinely measured and ordinarily exhibited comparable pharmacological behavior. DX 14, 15. This casts grave doubt on Merck's contention that there would be no reason to expect cyclobenzaprine to exhibit similar pharmacological activity to amitriptyline. Furthermore, in tests comparing the two compounds, generally analogous pharmacological activity was observed.

In an article by Metys et al, recording a Czechoslovakian study of anti-Parkinson's drugs with antidepressants, cyclobenzaprine and amitriptyline were found to display similar pharmacological traits. DX 30 at 262. Differences were present as well: "Of the antidepressive substances tested, only proheptatriene [cyclobenzaprine] was antagonistically effective against oxotremorine in doses similar to those of the central cholinolytics." Id. As Danbury argues, this difference in potency is more one of degree than of quality. It is nonetheless a true difference. Overall, however, the authors reported that "[a]ll of the antidepressants tested reduced the intensity of the tremor induced by oxotremorine to approximately the same extent." Id. This finding is generally supportive of the finding that amitriptyline and cyclobenzaprine

exhibit certain pharmacologically parallel actions.[20]

Other publications strengthen the proposition that amitriptyline and cyclobenzaprine are pharmacologically similar. An article published in 1962 by Stewart et al finds the central nervous system effects of the two compounds comparable. DX 26. And a 1963 Metysova publication found cyclobenzaprine "identical to the independently represented amitriptyline" in the type of effect noted on the central nervous system. DX 29 at 40 (translation). Given this evidence, the Court is comfortable in characterizing amitriptyline and cyclobenzaprine as sharing a pharmacological resemblance.

Absent prior art demonstrating that amitriptyline had selective muscle relaxant activity, pharmacological resemblance does not lead inevitably to the conclusion that the prior art contains the reasonable expectation that cyclobenzaprine would be a *selective* skeletal muscle relaxant. However, Danbury objects that even cyclobenzaprine is not truly selective. To examine the persuasiveness of Merck's case for cyclobenzaprine's selectivity as well as to test Danbury's obviousness claims, a review of the research leading to Share's claimed invention is helpful.

### E. Dr. Share's Work with Cyclobenzaprine

#### 1. Merck–Frosst's Skeletal Muscle Relaxant Program

Dr. Nathan Norman Share, the inventor of the use of cyclobenzaprine as a selective

---

marked sedative properties at effective blocking doses. This was indicated by a loss of righting reflex in animals at $ED_50$ levels of these two substances. This contrasts with the activity of MK–130 and amitriptyline where $ED_50$ levels were not associated with a loss of righting reflex. These results suggest that MK–130 and amitriptyline may be more specific in their ability to reduce skeletal muscle hyperactivity in mice.

DX 53 (Share's June 1970 Report) at MF004845. This evidence strongly suggests that amitriptyline may display some selectivity, undermining Merck's claim that cyclobenzaprine is unique in this respect. Determining amitriptyline's selectivity, however, is not absolutely crucial to the

analysis, because of the Court's conclusions with regard to the prior art.

20. Another example of the pharmacological similarities between amitriptyline and cyclobenzaprine is found in a 1962 article by Villani and others. DX 23. The Villani publication reports a study of the effects of various compounds, among them cyclobenzaprine and amitriptyline, "on the central nervous system" and behavior of laboratory animals. Id. at MF090215. Amitriptyline and cyclobenzaprine, like the other compounds tested, "elicited the same over-all behavioral pattern shown by [imipramine], namely, the depression of locomotor activity and sociability and a reduction in skeletal muscle tone." Id. at MF0902215.

skeletal muscle relaxant, holds a Ph.D. in pharmacology and has done post-doctoral work in autonomic nervous system function. Tr. at 347–48 (Share). Share headed the pharmacology department of Charles E. Frosst Laboratories ("Frosst"). Tr. at 349 (Share). Shortly after Share began work at Frosst, it was acquired by Merck. *Id.* Subsequently, Merck personnel met with Share and suggested that Share's research group undertake two research projects. Out of a list of several projects, Share chose the skeletal muscle relaxant project and one other project. Tr. at 354–54A (Share).

The muscle relaxants then available functioned effectively but nonselectively: i.e., they produced generalized depression of the patient and reduced normal muscle tone as well as affecting hypertonic muscle. Tr. at 355–56 (Share); 836 (Smith). Share sought a selectively acting muscle relaxant which would only affect the desired relaxation (the hypertonic muscle) and not normal muscle tone, that is, a drug "without behavioral depressant effects which would impair the normal motor activity associated with the ability to carry out the tasks of daily living." Tr. at 356 (Share).

Share began his research with two goals in mind: first, to develop superior animal test models, because he felt the existing models were not the best possible identifiers; and second, to use the new models to identify a selective skeletal muscle relaxant. Tr. at 357 (Share). He initially reviewed the literature to determine the state of the art. Share's literature search revealed that extant muscle relaxants shared properties in common with minor tranquilizers and sedatives. He determined therefore that drugs in these categories should

be screened using the classical skeletal muscle relaxant tests in order to form a data base for purposes of comparing the compounds tested in the main phase of his research. DX 43 at MF009845; Tr. at 360–61 (Share).

In connection with his first goal, Share developed the so-called veratramine test, which he believed offered advantages over the classical screening tests due to its supposed specificity to hypertonic activity, particularly that related to tremors and convulsions. MFF ¶ 38. The classical models were inferior in Share's view "because they could not detect relaxation of hypertonic activity alone, but rather they measured relaxation of *normal* muscle—precisely what Dr. Share's research sought to avoid." MFF ¶ 36 (Tr. at 360 (Share)).

The extensive testing conducted to develop the initial database included veratramine, an alkaloid (a substance of an organic nitrogenous base; atropine is one, as is cocaine). When the researchers injected mice with veratramine, the drug produced tremors, convulsions, and death. This effect was already known at the time of Share's research, *see* DX 36 at 70 (Smith article), but Share apparently was the first to utilize veratramine as a screen for skeletal muscle relaxant activity. DX 44; Tr. at 363–66 (Share); MFF ¶ 38.[21]

The veratramine test was fully in place by late 1966. It consisted of two parts: (1) testing each compound in five mice "to determine whether the test drug was capable of preventing any or all of the triad of responses produced by veratramine [tremors, convulsions, and death] ..."; (2) if three or more of the mice were protected from any of the responses, the second part of the test was run, which consisted of calculating the ED50 (the effective dose at

---

**21.** Share's group sorted the following classes of compounds through the veratramine test:
 (1) muscle relaxants
 (2) major tranquilizers
 (3) minor tranquilizers
 (4) hypnotics
 (5) anticonvulsants
 (6) heart muscle depressants
 (7) antidepressants
 (8) stimulants
 (9) antihistamines
 (10) ganglionic blockers
 (11) a-blockers
 (12) B-blockers
 (13) anticholinergics
 (14) neurohumorals
 (15) analgesics
 (16) other unspecified substances
Amitriptyline was one of the antidepressants tested. DX 45 at MF000933–40; Tr. at 372–74 (Share).

**14**

which 50% of the animals were protected from tremors, convulsions, and death). MFF ¶ 41; DX 45 at MF000932; Tr. at 369–70 (Share). Compounds that passed the second part of the test were deemed "leads." Tr. at 370 (Share).[22]

Share tested eighty-eight compounds in the initial phase of the test; twelve were selected for the second phase. PX 211 at MF009811; Tr. at 375–76 (Share). Share's testimony was that he first became interested in testing tricyclic compounds as a result of Dr. Smith's article, DX 36, which "referred to the muscle relaxant properties of the tricyclic compound chlorpromazine." MFF ¶ 46; Tr. at 377, 494–95 (Share). Chlorpromazine is sold as a tranquilizer. MFF ¶ 47.

According to Merck, Dr. Gleason ordered samples of tricyclics for Share's tests at Share's request. Tr. at 377 (Share); Dep. of Gleason at 11–12, 32–34; MFF ¶ 48. However, the memorandum written by Gleason to the personnel at the sample collection demonstrates that the tricyclics were also ordered as a result of the Sinha article. The pertinent part of the memorandum bears repeating:

> Results of the Veratramine Test on amitriptyline, and (a) recent report on central muscle relaxant activity of amitriptyline (Sinha et al, Jap.J.Pharmacol. *16:* 250, 1965) suggest submission of analogues to our muscle relaxant screen.

Following this request, twenty-three compounds were forwarded to Share for submission to the muscle relaxant test. Cyclobenzaprine was one of the two most active compounds reported by Share. "It protected ⅘ mice from tremors, ⅗ mice from convulsions and ⅕ mice from death. Amitriptyline also was among the 23 tricyclic compounds tested, but it was rated 'inactive' since it failed to protect any mice from tremors or death and protected only 2 mice

from convulsions." MFF ¶ 51 (citations omitted); Tr. at 377–82 (Share); DX 50 at MF009928–29. Share's group continued to identify new lead compounds through February 1968. PX 218 at MF010116; Tr. at 385 (Share). At that time, cyclobenzaprine and other lead compounds were subjected to "more rigorous follow-up tests in larger animals (such as rabbits and cats)." MFF ¶ 57. The more rigorous tests were designed to further winnow the lead compounds and determine which were candidates for clinical tests. Tr. at 386 (Share). Share felt, for various reasons, that the cat tests were among the more important follow-up tests. Tr. at 386–87 (Share), at 233–34 (Van Woert).

Share utilized several cat tests. One was the decerebrate model, "in which the test compound's effect against artificially produced rigidity was measured." MFF ¶ 59. The results of cyclobenzaprine in this type of test were as follows:

> [Cyclobenzaprine] show[s] a good order of activity in abolishing the rigidity. [It] ha[s] a long duration of action ($\geq$ 2 hrs) and showed no toxic manifestations at the blocking doses. Compared to mephenesin, diazepam and chlorpromazine in this type of study, both M–27–67 [cyclobenzaprine] and M–36–67 are more active than mephenesin, but less active than diazepam and chlorpromazine.

PX 218 at MF010116.

Another test, a more sophisticated one according to the plaintiff, was the ischemic cord rigidity test.

> In this test, a surgical procedure was performed to temporarily abolish the blood supply to the spinal cord in order to produce anoxia (a lack of oxygen) and destruction of certain neurons in the spinal cord, resulting in a persistent hindlimb rigidity. Share Tr. 391–392; Van Woert Tr. 130–131. By February 8,

---

**22.** Amitriptyline showed muscle relaxant activity in the initial veratramine screen. DX 45. However, in the screen of the first 23 tricyclics conducted in early 1967, amitriptyline's muscle relaxant activity was less impressive. The discrepancy is unexplained in the record. The most plausible explanation for the departure from the test protocol is that amitriptyline had

shown promise in the earlier screen. DX 45. Another possible explanation is the Sinha article's suggestion that amitriptyline was active as a muscle relaxant, which was reiterated in the Gleason memorandum. A third possible reason is that the research management heads at Merck required Share to continue testing amitriptyline. Tr. at 719–23 (Share).

1968, Dr. Share had tested eight known reference compounds from various therapeutic classifications in the ischemic cord rigidity model to establish a data base for this test....

MFF ¶ 60; Tr. at 391–93 (Share).

Amitriptyline was among the first eight compounds tested with the ischemic cord rigidity test.[23] Cyclobenzaprine was the most effective. PX 218 at MF010117. Share reported that cyclobenzaprine exhibited "a good order of activity against both decerebrate and ischemic cord rigidity in the cat," whereas diazepam (VALIUM) was "relatively ineffective" in one of the tests [24] and chlorpromazine caused some undesirable effects. PX 219; Tr. at 393–94 (Share). Amitriptyline's results in the ischemic cord and decerebrate rigidity tests were "far less active" than cyclobenzaprine's:

> Further studies were carried out with [cyclobenzaprine].... Cyclobenzaprine is still the most active lead compound. In a study involving a total of nine cats, the activity of this compound in abolishing decerebrate rigidity at low doses was consistent and long lasting and had a stabilizing effect on the knee-jerk at the blocking doses.
>
> ....
>
> In two cats amitriptyline had a weak and shortlasting effect.... The most active compound in this preparation is still M–27–67 (cyclobenzaprine).

PX 220 at MF010579–80.

During the veratramine assay, Share developed another screening tool, the MEPRIA test. Tr. at 395–96 (Share); PX 220; PX 212. Eventually, both the veratramine and the MEPRIA tests were being run concurrently, in part to determine which test better served as a predictor of muscle relaxant activity. Tr. at 395–98 (Share); PX 223 at MF010153. In the MEPRIA test, like the veratramine test, cyclobenzaprine proved the most successful. PX 223 at MF010153; Tr. at 398–99 (Share). The MEPRIA test turned out to be a superior screen, and in November—December 1968, the MEPRIA screen alone was used. PX 224.

Follow-up studies on cyclobenzaprine continued, and in January 1969, Share summarized the latest results he'd obtained:

> Further studies on the muscle relaxant properties of cyclobenzaprine in various rigid cat preparations are in progress. In the decerebrate cat, cyclobenzaprine, diazepam and chlorpromazine are approximately equiactive. However, in the ischemic-cord rigid cat preparation, only cyclobenzaprine appears to be active....

PX 224 at MF010160–61; Tr. at 400–01 (Share).

Share compared cyclobenzaprine with diazepam and chlorpromazine "because those compounds were considered to be the best of the clinically available centrally acting skeletal muscle relaxant agents at that time. Neither diazepam nor chlorpromazine, however, was selective in its ability to reduce hyperactive muscle activity." MFF ¶ 72.

A February 1969 report, "Cyclobenzaprine A Pharmacological Report," describes in detail Share's views of cyclobenzaprine's properties:

> Pharmacological studies have demonstrated that cyclobenzaprine possesses a unique pharmacodynamic action. This was shown by its ability to reduce or abolish the skeletal muscle hyperactivity in all animal models tested, at dose levels which had no observable behavioral depressant effects.
>
> ....
>
> The characteristics of the skeletal muscle relaxant activity of cyclobenzaprine apparently differs from that of chlorpromazine and diazepam.
>
> ....
>
> In these experiments, cyclobenzaprine was found to be less potent than diazepam in both intact and spinal ... sectioned mice, whereas chlorpromazine was inac-

---

23. PX 218; DX 45; Tr. at 504–06 (Share).

24. By 1970, diazepam was viewed as the most effective muscle relaxant sold. Tr. at 838 (Smith). Diazepam, however, has several "undesirable side effects, including amnesia and ataxia," and addictiveness. Tr. at 839 (Smith).

tive. However, the slope of the dose-response curve for cyclobenzaprine in intact and spinal mice were virtually identical, whereas that for diazepam was considerably flattened in spinal mice. This suggests that in contrast with chlorpromazine and diazepam, cyclobenzaprine may have a more specific action on the hyperactivity of skeletal motor systems at the spinal cord level.

. . . .

Thus, the activity of cyclobenzaprine appears to be highly consistent in several animal models exhibiting tonic skeletal muscle hyperactivity. The spectrum of pharmacologic activity appears to be sufficiently unique to suggest its usefulness in a wide range of clinically occurring spastic conditions.

PX 225 at MF020185–87.

Amitriptyline's results as a muscle relaxant were not as spectacular as cyclobenzaprine's results. However, in the June 1970 pharmacological report summarizing cyclobenzaprine's muscle relaxant properties, data on amitriptyline were included along with two "benchmark" compounds, chlorpromazine and diazepam. DX 53. Amitriptyline's muscle relaxant activity surpassed that of the two benchmark muscle relaxants. Additionally, "Dr. Share's report was uniformly regarded by Merck personnel as demonstrating that amitriptyline, as well as cyclobenzaprine, exhibited sufficiently impressive muscle relaxant activity to justify clinical trials." DFF ¶ 31; DX 56 ("Amitriptyline appears to be as active orally and have duration comparable to MK–130."); DX 57 (Cyclobenzaprine's reduction of skeletal muscle hyperactivity "shared by amitriptyline, although the latter compound is less potent in this respect and seems to be less consistent in its activity.").

In the light of this evidence, as well as the other record evidence collected by Danbury at DFF ¶ 31, the Court concludes that amitriptyline did display effectiveness as a skeletal muscle relaxant, but cyclobenzap-

rine was superior in potency and selectivity.

**2. The First Clinical Tests of Cyclobenzaprine as a Muscle Relaxant**

The first clinical studies of cyclobenzaprine's effectiveness as a skeletal muscle relaxant were conducted in June 1970 by Dr. Molina–Negro. PX 236. Merck's Research Management Council had approved the clinical tests in July 1969. PX 231 at MF098742; Tr. at 711–12 (Beyer).[25] Molina–Negro reported his first results on June 16, 1970. PX 236 at MF098448–49; Tr. at 413–15 (Share). Although the results were only of the first two patients studied, the report detailed dramatically favorable effects corroborating Share's animal studies. For this reason, the report caused excitement. Tr. at 713–14 (Beyer).

**F. Expanded Clinical Testing of Cyclobenzaprine**

Molina–Negro's dramatic study results spurred further clinical trials. Tr. at 715 (Beyer), 757 (Strickland). Merck determined to study cyclobenzaprine in three major clinical areas: A) spasticity; B) rigidity; and C) muscle spasm or splinting. DX 62.

Merck claimed at trial that cyclobenzaprine, despite its limited approved use (as a therapeutic agent for relief of local muscle spasm), showed efficacy in treating rigidity and spasticity as well. Danbury contests this characterization. Having assessed the evidence and in particular Merck's internal documents, the Court concludes that cyclobenzaprine's effectiveness in treating spasticity and rigidity is highly limited.

Several clinical studies were conducted to determine cyclobenzaprine's utility in treating each of these disorders. DX 19; DX 68; DX 69; Tr. at 759–69 (Strickland). Initial reports were encouraging:

Following our discussions re MK–130 it is apparent that we already have data highly suggestive that it is active in the following conditions:

1. Cerebral Palsy

**25.** Dr. Karl H. Beyer was then senior vice-president for research at Merck. He was responsible for "all biological research in the United States, Canada, France and Japan." MFF ¶ 79; Tr. at 710 (Beyer).

2. Parkinsonism
3. Cerebral Spasticity
4. Selected cases of spinal cord spasticity

Other neurological conditions and local muscle spasm will require additional time and effort to develop sufficient information to prove or disprove efficacy.

PX 251; Tr. at 759–60 (Strickland).

### 1. Spasticity

Clinical studies of spastic patients are made difficult by the great variety in location of the causal lesion, and by the assortment of symptoms. Merck emphasizes this difficulty as an explanation for its patent's claims of effectiveness in treating spasticity in light of cyclobenzaprine's eventually unfavorable results in the spasticity area. *See* MFF ¶ 118; Tr. at 757–58 (Strickland). The initial results were favorable.[26]

Later spasticity study results were reported in March 1972. DX 68. In two double blind studies of children with cerebral palsy:

> Nine of 12 patients on MK–130 showed slight improvement as did 5 of 11 on placebo. There were some anticholinergic side effects and the early results do not yet allow a conclusion as to whether this compound is or is not effective in Cerebral Palsy.

DX 68 at MF001774; Tr. at 762 (Strickland).

An international study of cerebral palsy patients revealed mixed results. In one study in Ansink, Netherlands, seven of nine patients showed remarkable progress. The other two studies were "less definitive." DX 68 at MF001775; Tr. at 763–64 (Strickland). Overall, in cerebral palsy patients, cyclobenzaprine showed some effectiveness, but further study (as reported in October 1972) indicated that cyclobenzaprine's usefulness in treating this disorder was limited. DX 71 at MF003364; Tr. at 767–68.

Additional study results on cyclobenzaprine's usefulness in treating spasticity were recounted at an October 1972 Merck meeting:

> A total of 14 domestic clinical studies were started in which 140 patients with spasticity were treated. There were 55 patients in the seven pilot studies and an additional 85 patients in the seven controlled studies.

> The results of the pilot and controlled studies in this condition reveal that some selected patients do show a favorable response as measured by overall improvement in function and by measurement of spasticity, rigidity, and changes in ability to perform the tasks of daily living. When compared against placebo, however, the improvement is not a significant one. So we conclude that the drug is not of therapeutic use in the treatment of muscle spasticity and rigidity associated with spinal cord or cerebral injury or disease.

DX 71 at MF003362; Tr. at 766 (Strickland).[27]

---

**26.** Among the studies which displayed favorable results were:
(i) Molina–Negro's study of fifteen patients, with doses from 40 to 60 milligrams per day, showed measurable betterment in fourteen patients with minimal side effects; (ii) Hercus's Australian study of one group of five patients, of which three did not respond, and two responded weakly, and a second group of five, of which four responded well at doses of forty milligrams per day; and (iii) van Winzum's Amsterdam study of eleven children with cerebral palsy and spasticity, of which eight responded well at doses of from one to three milligrams per kilogram of body weight. MFF ¶ 119.

**27.** Merck contests the superiority of double blind tests. Double blind tests study the effectiveness of a drug where neither the patient nor the doctor knows what medication the patient has received. The FDA requires double blind studies when assessing efficacy of new drugs. According to Merck, however,

> [t]hose studies . . . do not take advantage of the knowledge, experience and expertise of the clinicians using the drug, and are not ideal research tools for evaluating experimental drugs. Open studies, where the doctor is aware of the medication the patients receive, may introduce the bias of the investigator, but they do permit the valuable insight and the clinical judgement that the experienced clinician has acquired during his career to be utilized. The inability to obtain a statistically significant difference vs. placebo in a double-blind study does not mean the drug is ineffective.

MFF ¶ 125; Tr. at 746–47 (Beyer).

Share attended meetings at which the results of the spasticity studies was discussed. Tr. at 441 (Share); DX 66; DX 68. He believed the inconsistency of the results resulted from indiscriminate patient selection. In Share's opinion, patients with hyperphasic disorders (as opposed to those with hypertonic disorders) would not respond to cyclobenzaprine.[28]

Although cyclobenzaprine did help relieve spasticity in "a certain select group of patients suffering from spastic conditions,"[29] its results were insufficient to enable Merck to conclude it was effective in that clinical area.

### 2. Rigidity

Merck conducted clinical tests of Parkinson's patients' responses to cyclobenzaprine to obtain information on its utility in treating muscle rigidity. MFF ¶ 129. By February 1971 Merck had received preliminary information on the utility of cyclobenzaprine in treating Parkinsonism. Six patients were studied: five of the six responded well, "with significant increase in function comparable to treatment with L–Dopa."[30] DX 66 at MF001325. Tr. at 761 (Strickland). Results of another study were reported in March 1972. The patients in this study were those who experienced side effects from L–Dopa, or who did not respond to L–Dopa. Four patients improved. DX 68 at MF001774; Tr. at 762–63 (Strickland).[31]

While Merck's results in area of rigidity showed some promise, ultimately Merck personnel concluded in November 1972 that cyclobenzaprine "is not of therapeutic use in the treatment of muscle spasticity and rigidity associated with spinal cord or cerebral injury or disease." DX 72 at MF097309 (MK–130 In–Depth Review Meeting Minutes). Thus, Merck's present claim that cyclobenzaprine showed usefulness in treating muscle rigidity patients[32] is unpersuasive. The Court concludes that cyclobenzaprine is not and was not viewed by Merck as a viable treatment for muscular rigidity. The clinical evidence on the drug's utility in treating muscle spasm however is different.

### 3. Muscle Spasm

Cyclobenzaprine's clinical results in the treatment of muscle spasm were significantly more favorable than the results obtained in the spasticity and rigidity studies. In the March 1972 review of clinical outcomes, two studies by Aiken and Oates strongly indicated cyclobenzaprine's efficacy in the treatment of muscle spasm. The Aiken and Oates results spurred Merck to the decision to further investigate the usefulness of cyclobenzaprine in muscle spasm "with carefully chosen studies." DX 68 at MF001773. "Initiation of new studies" for spasticity and Parkinson's disease, by contrast, were "deferred." Id.

The Aiken and Oates studies revealed that cyclobenzaprine performed well in patients suffering from muscle spasm. As the March 1972 review minutes noted:

> The studies by Dr. Aiken and Dr. Oates show the drug is effective in the treatment of spasm. Generally, side effects of dry mouth and drowsiness were observed but were not incapacitating and were reduced by adjustment of dosage. Dr. Aiken had 15 out of 19 patients with

---

28. Share aired these views in an April 22, 1971 memo:

> Concerning MK–130: We know that the compound is not a panacea for all types of spasticities, but rather that it has unique properties as a skeletal muscle relaxant which require definition in terms of clinical utility. The various clinical reports, although not detailed as yet, appear to support and confirm our animal data. Thus, somewhat surprised at the meeting. Nonetheless, re-equilibration as you *suggested, may prove beneficial*."

PX 259 at MF001358.

29. MFF ¶ 128; Tr. at 590 (Share).

30. L–Dopa is the drug of choice for treating Parkinsonism. It was invented by Van Woert. Tr. at 47 (Van Woert).

31. *See also* DX 68 at MF001775–76; Tr. at 764 (Strickland); MFF ¶ 132, 133. Double blind studies comparing cyclobenzaprine's effectiveness with COGENTIN (an anti-Parkinson's drug then on the market) showed cyclobenzaprine was equally active. Tr. at 769 (Strickland). However, cyclobenzaprine produce some undesirable side effects, in particular, drowsiness.

32. Tr. at 590 (Share), 769 (Strickland); MFF ¶ 135.

good to excellent responses versus 3 out of 18 on placebo. Dr. Oates had 15 out of 32 patients with good to excellent responses versus 5 out of 28 with placebo. DX 71 at MF003366–68.

And in November 1972, Merck concluded: The two double-blind controlled studies in patients with post-traumatic voluntary muscle spasm show MK–130 to be significantly more effective than placebo. We conclude that MK–130 is an effective drug in the treatment of this condition. The side effects, *drowsiness*, dry mouth and bad taste, are significantly more frequent in the MK–130 group ... and will be the ones most commonly seen when the drug is used in outpatients.

DX 71 at MF003372; DX 72 at MF097312 (emphasis added).

Cyclobenzaprine was then extensively studied for usefulness in treating local muscle spasm, with consistently favorable results. In 1975, Merck applied for FDA approval of the use of cyclobenzaprine for treatment of muscle spasm. In 1977, the FDA sanctioned the use of cyclobenzaprine "as an adjunct to rest and physical therapy of muscle spasm associated with acute painful musculoskeletal conditions." MFF ¶ 140; Tr. at 758–59; DX 9; DX 10.

### 4. Drowsiness, Sedation and Cyclobenzaprine's Selectivity

Merck and Danbury have spent a considerable amount of time disputing cyclobenzaprine's propensity to produce sedation or drowsiness. Merck offered testimony that drowsiness was distinct from sedation, defining drowsiness as "primarily a subjective, personal sensation, involving a feeling of being sleepy, wanting to go to sleep, or the sensation of beginning to go to sleep." MFF ¶ 141; Tr. at 828, 937 (Smith), 781 (Strickland). Danbury disputes this characterization, asserting that drowsiness is in

effect an advanced degree of sedation. Tr. at 78–79 (Van Woert); DFF ¶ 42 ("[I]t is evident that drowsiness is an outward manifestation of a degree of sedation.").

Turning first to Merck's position that the distinctions between drowsiness and sedation are significant and that drowsiness cannot be equated with sedation: At least the latter part of this position rings true, but the significance of the two terms does not end there. The more important point is whether drowsiness is related to sedation, or is a form of sedation. And while some Merck trial witnesses contested the relationship of drowsiness and sedation,[33] others conceded that there was no significant difference between drowsiness and sedation.[34]

The reason this question so preoccupies the parties is that Merck's patent to a large degree rests on cyclobenzaprine's selective action, i.e., its ability to reduce abnormal (hypertonic) muscle tone without reducing normal muscle tone and thus interfering with the patient's daily activities. Side effects such as drowsiness and to a greater extent sedation suggest nonselectivity. However, the possibility exists that cyclobenzaprine may be selective in certain aspects and nonselective in others.

Although Danbury challenges Merck's differentiation of drowsiness and sedation, the Court is unaware of a charge by Danbury that cyclobenzaprine causes muscle weakness or loss of coordination. It is also unclear to the Court whether or not all (or any) forms of sedation result in a reduction of normal muscle tone. In any event, Danbury has not carried its burden of proving that cyclobenzaprine fails to act selectively with respect to its effects on normal tone. As for drowsiness, it appears incontestable that drowsiness falls within the range of

---

**33.** *See, e.g.,* Tr. at 829 (Smith).

**34.** *See, e.g.,* Tr. at 676 (Engelhardt). Sedation, Merck urges, "relates to the depression of activity accompanied by a wide cluster of different signs and symptoms," and "results in a decrease in responsiveness to both external or internal stimuli." MFF ¶ 142. Merck goes on to contrast drowsiness with sedation by stating that "[d]rowsiness is a subjective state involving

sleep systems, whereas sedation involves *sleep systems* in addition to a wider variety of ... responses." MFF ¶ 143; Tr. at 829–31 (Smith), 524–25 (Share). But what strikes the Court as most crucial is Merck's position that impairment of muscle strength or coordination is not associated with drowsiness. Tr. at 829 (Smith), 569–73 (Share).

"sedative" effects, and is a problematic side effect of the drug: to this extent, cyclobenzaprine is less selective than Merck claims.[35]

### G. *Merck's Clinical Testing of Amitriptyline as a Muscle Relaxant*

Amitriptyline has been sold as an antidepressant since 1961. The FDA has never approved it for use as a muscle relaxant. In 1966, as part of the veratramine screening test, Merck ascertained that amitriptyline was "more potent with respect to tremors and convulsions than several of the commercially available muscle relaxants." Tr. at 492–A (Share). The following January Gleason wrote the memorandum to the sample library which references inter alia the Sinha article's conclusions with regard to amitriptyline's muscle relaxant activity. DX 48. Then, in May 1967, Share reported the results of the veratramine test of the compounds sent in response to Gleason's memorandum. This report was the first explicit written indication of cyclobenzaprine's activity as a muscle relaxant. DX 50; DFF ¶ 29.

Merck characterizes amitriptyline's results in Share's tests as inconsistent, of shorter duration than cyclobenzaprine's, and accompanied by ataxia and tremors, contraindicating its use as a muscle relaxant. DX-53 at MF004865–66 (Tables 7 & 8); DX 18 at MF093347–48 (Tables 7 & 8); Tr. at 424–428 (Share); Tr. 718–719 (Beyer).

Merck contends that the reasons for pursuing testing of amitriptyline were primarily due to "marketing and competitive impetus." MFF ¶ 154. A Merck internal memorandum partially corroborates this contention. PX 243 at MF001553. Tr. at 719, 723 (Beyer). But the memorandum also may be read to support Danbury's contention that amitriptyline's muscle relaxant properties were neither unknown nor uninteresting to Merck:

> Amitriptyline may possess some of the unique attributes of MK–130 as a muscle relaxant. However, any discussion of the market potential of MK–130 vs. amitriptyline appears premature since the limited data obtained in animals suggest differences in the mode of action of the two compounds and since we lack any clinical data confirming the effectiveness of amitriptyline as a muscle relaxant in man. Anyway, we could expect essentially the same competition from HLR on amitriptyline in this new indication as we expect on MK–130.

PX 243. at MF001553. Minutes from a Research Management Council meeting on January 6, 1971, similarly support the concern with Roche's entry into the muscle relaxant market, and the consequent interest in marketing amitriptyline.[36]

Amitriptyline was tested in spastic patients, and, like cyclobenzaprine, found ineffective. Tr. at 152 (Van Woert), 437 (Share); DX 64 at MF102799, 102828–29, 102861062, and 102895–96; PX 255 at MF098295–96. However, Merck's research Program Plan for 1972 discussed possible therapeutic uses for amitriptyline:

> ELAVIL did not show a significant effect in spasticity of voluntary musculature associated with CNS injury or disease. However, our initial trials with MK–130 in patients respond, and resulted in our narrowing our criteria for selection for treatment. The patients treated should have some residual voluntary muscle power. Flexor spasms without associated spasticity, as in patients with transected cords, do not respond. It is not clear whether more precise patient

---

**35.** *See* DX 9 and 10 (FDA label and basis for approval: 40% of patients experience drowsiness); PX 284 (advertising); DX 111 at MF101612 (drowsiness reported by physicians prescribing the drug). *See also* DX 71 at MF003366–68, and 72 at MF097312.

**36.** The minutes state, in pertinent part:
The preliminary indications are that ELAVIL may not be active, but a meaningful answer

should be available about the middle of February.... The studies are being conducted in top-notch centers and the investigators can be switched over to MK–130 when their ELAVIL work is done. It was reported that we have received no indication of Roche activity in the clinic with either ELAVIL or MK–130.
PX 250 at MF–099352.

definition would have affected the results.

DX 65 at MF096279. Interestingly, the need for more precise patient population definition is also cited by Merck in support of its arguments that cyclobenzaprine displayed some efficacy in the treatment of spasticity.

Merck did not pursue clinical studies of amitriptyline in areas other than spasticity, claiming among other reasons that the compound's poor results in that clinical area caused a lack of interest in continuing clinical testing. PX 258 at MF001407. Perhaps the most understandable reason proffered is the length of time amitriptyline had been on the market as an antidepressant. Tr. at 401–02, 404–05, 419–20 (Share), 630–31 (Engelhardt). Another notable explanation is that amitriptyline produced ataxia and other adverse side effects. Tr. at 885–86 (Smith).

Danbury argues that Merck's failure to test amitriptyline further is most plausibly explained by the reality that Merck could not have obtained a patent for amitriptyline as a muscle relaxant in light of the Sinha publications. The undated note by Rooney lends some support to this theory.[37] Despite the doubt created by the defendant's evidence of the muscle relaxant activity exhibited by amitriptyline, the Court finds the differences in potency and the incidence of ataxia in amitriptyline (which is not present in cyclobenzaprine at effective doses) sufficient explanation for the disparate expenditure of clinical resources. Cyclobenzaprine's initial results in Molina–Negro's spasticity studies were dramatically favorable. Although these results were not borne out in later studies, they probably provided the impetus for more extensive testing of cyclobenzaprine, especially in light of Share's results with the compound in animal tests. The most troubling component of Merck's treatment of the amitriptyline test results occurs in connection with the submission of applications for approval of cyclobenzaprine to the FDA and the prosecution of the Share patent.

### H. Merck's FDA Submissions

As part of its inequitable conduct theory, Danbury relies on the information Merck submitted to the FDA during the same general time frame of the patent prosecution (1970–1975). There are striking contrasts between the data prepared and sent to the FDA and the data submitted to the patent examiner at the PTO. The full significance of these contrasts will be discussed in the portion of the Opinion addressing the Court's conclusions of law.

Merck submitted its first Investigational New Drug ("IND") application to the FDA in September 1970. DX 18. The IND contained data from studies of cyclobenzaprine in animals, as well as the initial Molina–Negro spasticity results. *Id.* The IND also contained data on amitriptyline's activity as a muscle relaxant. *Id.* The previous June, Share had drafted a report in preparation for the FDA application. DX 53. The June 1970 report also included amitriptyline data. *Id.* The interpretation of that data and the reasons for including them are disputed by the parties.

Share maintains that the data were included solely because Merck's management felt that the FDA "would request a comparison [of amitriptyline and cyclobenzaprine] because the chemical analogs are so close that they [the FDA] would be hard pressed to believe that there was this unique difference [between the two compounds]." Tr. at 432 (Share). According to Share, his belief in amitriptyline's lack of potential as a muscle relaxant never wavered, and therefore he did not inform Merck's patent agent, Arther, of the amitriptyline data or of the amitriptyline prior art. Tr. at 419–20 (Share).

Cyclobenzaprine's selectivity was emphasized in Merck's IND, submitted to the FDA in September 1970 (DX 18), and in "Merck's Revised Clinical Operational Plan" dated October 5, 1970 (DX 62). The IND described cyclobenzaprine, referred to as MK–130, as having the ability "to reduce or abolish skeletal muscle hyperactivity and spasticity in all of the animal models

**37.** DX 95.

tested at dose levels which had no observable behavioral depressant effects." DX 18 at MF093309. Cyclobenzaprine's activity was described as "lissive." DX 62 at MF001634:

> The rationale for initiating clinical trials of MK–130 as a lissive agent in man is that this agent appears to have highly consistent lissive activity in animal models exhibiting tonic skeletal muscle hyperactivity. MK–130 seems to act at peripheral levels within the nervous system, while it also possesses considerable tranquilizing activity. Furthermore, muscle relaxant activity occurs at doses below those producing a sedating effect.

DX 62 at MF001634–35.

Share's mice test results showed similarities between the action of cyclobenzaprine and amitriptyline:

> MK–130 also possessed skeletal muscle spasmolytic activity in mice. . . . The activity of MK–130 in this situation resembles that with amitriptyline but contrasts with the activity of chlorpromazine and diazepam, where a loss of righting reflex occurred in all animals in which the muscle spasm was abolished.
>
> Differences in drug activity were also demonstrated in experiments involving electrical and chemical-induced tonic extensor seizures. In these experiments, both MK–130 and amitriptyline were somewhat less active than diazepam but considerably more active than chlorpromazine. However, protective indices of greater than 1.0 could only be demonstrated for MK–130 and amitriptyline. This suggests that, in contrast with chlorpromazine and diazepam, both MK–130 and amitriptyline may have a more specific action on the hyperactivity of skeletal motor systems in mice.

DX 18 at MF093311–12.

Table 7 of both the IND and Share's June 1970 report displays the data from the ischemic cord rigidity testing of cyclobenzaprine, amitriptyline, chlorpromazine and diazepam. Merck calls the test "the most definitive test for selective muscle relaxation." MFF ¶ 93; Tr. at 423 (Share). The observations recorded in table 7 show that cyclobenzaprine was the only compound of the four to show a consistent reduction of hypertonic skeletal muscle, without producing adverse behavioral effects such as ataxia. *See* DX 18 at MF093347.

Tests also were performed on normal cats to assess whether the test compounds administered produced unfavorable neurotoxic results. The data resulting from these tests were reported in Table 8 of the report and the IND. DX 53; DX 18; Tr. at 425–26 (Share).

There were three neurotoxicity tests: (1) the ataxia test; (2) the loss of grip reflex test; and (3) the loss of righting reflex test. Tr. at 425–26 (Share).[38] Only cyclobenzaprine reduced hypertonic muscle activity at low enough doses to avoid the undesirable neurotoxic effects. *See* MFF ¶ 98. Amitriptyline performed less well, although its figures were better than those for chlorpromazine or diazepam. Additionally, amitriptyline-treated cats and rabbits displayed tremors in some tests. *See* App. C; MFF ¶ 100; DX 18; DX 53; Tr. at 579–84 (Share).

In one set of experiments, amitriptyline was administered orally and achieved results comparable to cyclobenzaprine in terms of duration of action and reduction of hypertonicity. DX 56. DX 56 is the minutes of a meeting attended by Gleason, Rooney, and Share, among others. The minutes do not indicate whether amitriptyline produced undesirable side effects such as ataxia.

The IND of September 1970 outlined the muscle relaxant properties of cyclobenzaprine as follows:

> Thus, the consistent activity of MK–130 in reducing or abolishing excessive skele-

---

**38.** The ataxia test measured the normal cat's ability to walk in a straight line after receiving progressively larger doses of the test compound. The loss of grip reflex test measured the doses of the compound necessary to cause a normal cat to lose its grip on a vertical wire screen. The loss of righting reflex test measured the ability of a normal cat to right itself when placed on its back after receiving incrementally larger amounts of the test compound. Tr. at 425–26 (Share).

tal muscle activity in several animal models, including mice, rabbits and cats, at dose levels which exhibited no observable neurotoxic or behavioral depressant effects, has been demonstrated. MK–130 was also found to be highly active upon oral administration in both mice and cats. Additionally, tachyphylaxis [gradual resistance upon repeated administration] to drug activity could not be demonstrated in mice or cats. The results suggest that MK–130 possesses a highly novel type of skeletal muscle spasmolytic activity. DX 18 at MF093340.

In July 1973, Merck submitted the Phase I and II Report on cyclobenzaprine to the FDA. DX 19. The report compiled, summarized and evaluated the research—both pre-clinical and clinical—on cyclobenzaprine conducted under Merck's auspices as well as in the literature. The report included material present in the original IND (DX 18) in addition to later studies. The data contained in the report thus encompassed that reviewed by Merck internally in March and November of 1972, establishing that cyclobenzaprine was ineffective in treating spasticity and that its predominant side effect was drowsiness. DX 19. The 1973 FDA submission also reviewed the Aiken and Oates studies, reporting that drowsiness occurred in fourteen of twenty-five patients in one study and twenty-one of twenty-five patients in another study, at doses of thirty to sixty milligrams per day. DX 19 at MF093006.

Merck submitted a New Drug Application ("NDA") to the FDA in December 1975. DX 78. In the NDA, Merck sought approval to market cyclobenzaprine as a skeletal muscle relaxant useful in relieving local muscle spasm. Merck's representations to the FDA in the NDA were consistent with its earlier submissions: Merck reiterated its previous revelation that cyclobenzaprine did not demonstrate effectiveness in treating muscular disorders such as cerebral palsy (central nervous system related disorders) and Merck referred again to cyclobenzaprine's propensity for inducing drowsiness in patients treated for local muscle spasm. DX 78 at MF102583.

The FDA approved Merck's application in 1977. *See* DX 9. The approval, for the use of cyclobenzaprine under the tradename FLEXERIL, was limited to use as "an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions." DX 10 at MF067603. Included in the package insert required by the FDA was the following statement: "FLEXERIL has not been found effective in the treatment of spasticity associated with cerebral or spinal cord disease or in children with cerebral palsy." *Id.* The package insert also notes the most frequent side effect: drowsiness. *Id.* at MF067604.

#### I. *Prosecution of the '246 Patent*

Thomas E. Arther, a registered patent agent with a Bachelor's degree in chemistry who worked in Merck's patent department, began to prepare a patent application to be filed in Canada based on Share's cyclobenzaprine research. PX 225, 235; DX 52, 81; Tr. at 406–407 (Share). Share was Arther's sole source of information regarding the pertinent prior art. Dep. of Arther at 45. Arther forwarded drafts of the Canadian patent application to Share on June 24, 1970, which Share reviewed and corrected. Tr. at 416 (Share); DX 80, 81.

Merck filed the Canadian application July 7, 1970. *See* DX 79. On May 21, 1971, Merck filed a United States application, claiming priority to the Canadian filing date. DX 79; Tr. at 415–17 (Share). The application describes the administration of cyclobenzaprine in units of from one to twenty milligrams, with dosage ranging from 0.05 to 0.55 milligrams per kilogram daily. The described purpose is for the relief of muscle spasm without sedative or depressant side effects. Specifically, the application calls for administration to patients suffering from "skeletal muscle spasm or related muscular disorders." DX 79 at 31. Although cyclobenzaprine's selectivity is not explicitly laid out, the application does state:

> The compositions of cyclobenzaprine are unusually specific in their muscle relaxant properties and the administration of

the compositions of cyclobenzaprine or a salt in either oral or injectable form results in an extremely rapid onset of action of the medication. The administration of the composition of my invention is also surprisingly free from any toxic reactions or side effects resulting from the medication.... Remarkably, at the dosage levels recommended for the treatment of muscular spasm, there is a complete absence of any tranquilizing effect or other noticeable behavioral effects.

*Id.* at 31–32. Additionally, the application describes the object of cyclobenzaprine's action as "alleviation of muscular spasm without the attendant side effects of sedation, depression, and other objectionable pharmacological effects." *Id.* at 27 (lines 19–22).

### 1. *First U.S. Application: May 21, 1971*

Merck's filed its first United States patent application (S.N. 145,875) on May 21, 1971. The application claimed Share's method of treating skeletal muscle spasm with cyclobenzaprine. DX 79. Again Arther prepared the application based on information provided by Share. Tr. at 409–10, 416–17 (Share); DX 81.

This application contained the following disclosures:

At present a variety of medicinals are used in an attempt to relieve or correct the clinical disorders involving muscle hyperactivity including muscle spasm and spasticity and the pain associated therewith. But use of these various materials unfortunately is attended by concomitant side effects and toxicity which limit the usefulness of these medicinals. There is an unsatisfied need at the present time for a medication which has a high specific effect on muscle hyperactivity causing various clinical disorders ... and which at the same time has a minimum of side effects or contraindications.

DX 79 at 7 (line 26)—8 (line 6).

It is a further object of the present invention to provide methods and compositions for the alleviation of muscle hyper-

activity including muscular spasm, spasticity and rigidity without the attendant side effects of sedation, depression, and other objectionable pharmacological effects.

*Id.* at 8 (line 29)—9 (line 1).

The compositions of cyclobenzaprine are unusually specific in their muscle relaxant properties and the administration of the compositions of cyclobenzaprine ... results in an extremely rapid onset of action of the medication. The administration of the compositions of my invention is also surprisingly free from any toxic reactions or side effects resulting from the medication. This is completely unexpected since the above cited patent mentions the use of higher dosage levels of the drug to quiet or tranquilize cattle. Remarkably, at the dosage levels recommended for the treatment of muscle spasm, there is a complete absence of any tranquilizing effect or other noticeable behavioral effects.

*Id.* at 13 (lines 10–22).

The first U.S. application disclosed a dosage unit of one to twenty milligrams, *id.* at 6, and one to twenty-five milligrams of cyclobenzaprine. *Id.* at 7. The application contained detailed information regarding suitable dosages:

The optimum dosage depends of course on the dosage form being used and the type and severity of the condition being treated. In any specific case, the appropriate dosage selected will further depend on factors of the patient.... [O]ral dose levels of the preferred formulation in the range of .05 to 2 mg./kg. per day show excellent effectiveness in adults, especially in the range of 0.1 to 0.4 mg./kg. per day. In children, on the other hand, the dose levels employed in various conditions range from 0.05 to 5 mg. per day.

DX 79 at 11.

Several differences between the Canadian application and the first U.S. application are worth noting. First, the dosage range claimed was expanded from 0.05 to 0.55 milligrams per kilogram daily to 0.05 to 5.0 milligrams per kilogram daily. Second, the

description of the targeted disorders was changed to include "muscle hyperactivity including muscular spasm [described in the Canadian application], spasticity, and rigidity [not mentioned in the Canadian application.]" *Id.* at 8 (lines 31–32). The description of cyclobenzaprine's "unusually specific" action remained unmodified.

On March 20, 1972, the examiner rejected all the claims for obviousness, based on a combination of the original Cope and Engelhardt patent claiming the compound cyclobenzaprine (DX 2) and an article by Parkes teaching that tranquilizers are useful in inducing "muscular relaxation." DX 90 at 93 (Parkes, Progress in Medicinal Chemistry, at 72, 92–94 (1961)). The examiner stated:

> [The Cope and Engelhardt patent] teaches the instant compounds and salts thereof as old. They are taught to have depressant or tranquilizing activity when administered by various modes. Many of the claimed dosages are included in the teaching. Those dosages not taught and not having been shown to be critical are considered within the skill of the art.

DX 79 at 40.

In response, on June 16, 1972, Merck abandoned several of the claims, and amended claim one of the patent. The amended claim read:

> CLAIM 1 (Amended)—A method for treating patients afflicted with [disorders involving muscle hyperactivity] *muscle spasm, muscle spasticity, muscle rigidity, or muscle splinting* which comprises administering to said patient a therapeutically effective and safe quantity of [a compound of] cyclobenzaprine ... or a pharmaceutically acceptable non-toxic acid addition salt thereof [.] , *in an amount between .05 to 5 mg./kg./day of said cyclobenzaprine or salt.*

DX 79 at 42 (June 16, 1972 amendment). "Muscle spasm, muscle spasticity, muscle rigidity, or muscle splinting" was substituted for "disorders involving muscle hyperactivity." "In an amount between .05 to 5 mg./kg./day" was also added. *Id.* In addition, Merck made the following arguments:

The other reference cited [besides the Cope/Engelhardt patent] is excerpted from an article by Parkes on Tranquillizers.... This is said to show that it would be indicated to try a depressant for use in the treatment of spasm or muscle relaxation. It is believed that this reference is defective as an indication that effective muscle relaxants will be found among drugs which are central nervous system depressants. In this connection, we would like to call to the attention of the Examiner an article ... [which] points out that "The need for a central acting skeletal muscle relaxant which is orally effective at a reasonable dose continues to exist."

DX 79 at 43 (June 1972 amendment). Merck argued that the article demonstrated that there was a long-felt and unfulfilled need for a compound such as cyclobenzaprine in the use suggested. Merck also contended that the art cited by the examiner actually taught away from testing a tranquilizer (such as cyclobenzaprine) as a muscle relaxant because the Parkes article instructs that tranquilizers relax normal muscle tone, an effect cyclobenzaprine purportedly avoided. *Id.* at 44.

Incredibly, Merck also argued that cyclobenzaprine was effective "without the attendant side effect of ... drowsiness." *Id.* at 45. In Merck's own words:

> In testing cyclobenzaprine as a tranquilizer in humans, it was found necessary to administer the compound in relatively high does, i.e., on the order of at least 700 [sic] mg/kg/day before any depressant or tranquilizing activity could be noted. It is therefore believed that there is no suggestion in the cited [Cope cyclobenzaprine] patent or [Parkes] article that cyclobenzaprine would be an effective agent for treating muscle spasm or spasticity without the attendant side effect of depression or causing muscle weakness and drowsiness. It is believed that the discovery of this unique effects [sic] of cyclobenzaprine is entirely unexpected.

DX 79 at 45. Despite these efforts, the examiner issued a final rejection of the claims. DX 79 at 63.

### 2. *The First Continuation-in-Part Application: January 31, 1973*

Merck abandoned its 1971 application in favor of a continuation-in-part application ("c-i-p") filed January 31, 1973. DX 94. The description of the operation of the claimed drug had by then evolved to "selectively reduc[ing] skeletal muscle tonic hyperactivity without effecting any loss in normal muscle strength or causing any attendant sedation, behavioral effects or other effects ordinarily associated with nervous system depressants." DX 94 at MF102249–50. This is the first specific mention of cyclobenzaprine's selective qualities.

> The c-i-p goes on to state:
> The unusual and selective effect of cyclobenzaprine in reducing muscle hyperactivity associated with spasm has been demonstrated in test animals in comparison with other centrally active agents reported to have some muscle relaxant activity. In such tests cyclobenzaprine is shown to be highly effective as a spasmolytic agent (reduces skeletal muscle hyperactivity) with no ataxia (failure of muscle coordination) at the effective dose levels. Other compounds tested were not effective at this level without displaying ataxia and other evidence of loss of muscle strength.

*Id.* at MF102255.

Other changes were made as well. Claim One was amended to recount the use of the compound in a dosage ranging from 0.05 milligrams to 5.0 milligrams per kilogram a day to "selectively reduce muscle hypertonic activity without significantly reducing normal muscle strength or coordination." *Id.* at MF102263. And Merck reduced the maximum unit dosage of cyclobenzaprine from twenty-five milligrams to twenty milligrams. *Id.*

On June 22, 1973, the examiner again rejected the claims as obvious, citing the same art. *Id.* at MF000139. Undaunted, Merck amended the c-i-p in September 1973. In the amendment to the c-i-p, Merck urged that the claims were not obvious because the Share method of administering cyclobenzaprine was not disclosed in the references relied upon by the examiner. Those references, according to Merck, taught that "tranquilizers would have central nervous system depressant activity." Cyclobenzaprine, in contrast, "[a]t the doses employed in the presently claimed method," exhibited "no central nervous system depressant effects." *Id.* at MF000165. With the claimed method of use of cyclobenzaprine, Merck argued:

> There is no reduction in normal muscle strength or coordination which might be expected from a tranquilizing drug. It is therefore believed that the method claimed in the present application is not taught either by the [Cope] patent, which discloses the tranquilizing activity of cyclobenzaprine, or by the Parkes review article on tranquillizers, which discloses that these *tranquillizing drugs belong to the central nervous system depressant class of drugs, illustrated by tranquillizing properties, sedative effects and reduction of muscle strength and coordination. None of these effects is present at the dosage levels employed in the presently claimed method.*

*Id.* at MF000166 (emphasis added). Nevertheless, on November 15, 1973, the claims were again rejected. *Id.* at MF000132–33.

Despite the examiner's consistent refusal to allow the claims, he did grant Merck an office interview to discuss the cyclobenzaprine application. *Id.* at MF000135. The events of that interview are summarized in a January 3, 1974 letter from Arther to the PTO:

> At the interview, it was pointed out that the claims of the application are now limited to a method of treating specific muscle disorders with a defined dose of cyclobenzaprine to alleviate the disorder *without attendant side effects* of tranquilizers of *reducing normal muscle strength or coordination.*
>
> Also at the interview a related application ... of the same inventor was discussed and the similarity between the

two cases emphasized. In the related application, claims to a method of treating specific muscle disorders with a specific compound of defined formula to alleviate the disorder without attendant side effects such as dry mouth were indicated as allowable. . . .

In view of the arguments presented and the similarity to the claims of [the related application], the Examiner indicated that he would allow the claims 1–5 in the subject application.

*Id.* at MF000135–36 (emphasis in original).

### 3. Second Continuation-in-Part Application: April 9, 1974

Despite the claims being allowed, Merck filed another c-i-p application on April 9, 1974. DX 96, 98. The previously allowed claims again were allowed. On May 6, 1975, the '246 patent issued. *See* PX 200. In its final form, claim one of the patent reads:

1. A method for treating patients afflicted with disorders involving skeletal muscle hypertonic activity selected from the group consisting of muscle spasm, muscle spasticity, muscle rigidity or muscle splinting which comprises administering to said patient a therapeutically effective and safe dosage of cyclobenzaprine ... or a pharmaceutically acceptable non-toxic acid addition salt thereof in a amount between 0.05 to 5 mg./kg./day of said cyclobenzaprine or salt to selectively reduce skeletal muscle hypertonic activity without significantly reducing normal muscle strength or coordination.

### 4. Summary of Prosecution History

Merck contends that during the prosecution it "consistently argued that Dr. Share's invention produced skeletal muscle relaxation without causing depressant effects or muscle weakness." MFF ¶ 180. In support of this contention, Merck relies on the following excerpts from the filewrapper:

(i) in the June 16, 1972 amendment to the first U.S. application (DX 79 at 45): "without the attendant side effect of de-pression or causing *muscle weakness and drowsiness*" (emphasis added);

(ii) in the September 13, 1973 amendment to second U.S. application (DX 94 at MF000164–66): "without significantly affecting normal muscle strength or coordination," *"without causing any loss in normal muscle strength or any attendant behavioral effects or other effects ordinarily associated with other central nervous system depressants"* (emphasis in original), "there are no central nervous system depressant effects noted"; and (iii) in the January 3, 1974 Arther letter to PTO (DX 94 at MF000135–36): *"without attendant side effects of tranquilizers of reducing normal muscle strength or coordination"* (emphasis in original).

Thus, the patent prosecution history of cyclobenzaprine reveals that, in the eyes of the PTO, cyclobenzaprine's lack of obviousness was dependent on its unpredictable selectivity. Absent that quality, the PTO considered the drug an obvious muscle relaxant, because of the prior art references to the muscle relaxant properties of tranquilizers. Merck established cyclobenzaprine's selectivity to the satisfaction of the reluctant examiner, and the Court also adopts the view that cyclobenzaprine is selective—to a point. There is no evidence that cyclobenzaprine causes a reduction of normal muscle tone when administered according to the method described in the '246 patent. However, there is a substantial amount of undisputed evidence that cyclobenzaprine causes drowsiness. To the extent that drowsiness falls within the spectrum of sedation, it appears to the Court that cyclobenzaprine produces sedative effects, although not muscle weakness. Therefore, the Court finds cyclobenzaprine's selectivity is limited to its operation without reducing normal muscle tone.

The parties have limited their arguments to selectivity versus nonselectivity. Nevertheless, given that it is the defendant's burden to overcome the patent's presumption of validity by clear and convincing evidence, and given that there is no evidence that cyclobenzaprine causes loss of normal muscle tone, I conclude that cyclo-

benzaprine is selective, although, because of the drowsiness side effect, not as selective as Merck contends.

### J. Cyclobenzaprine's Commercial Record

The available muscle relaxants prior to the introduction suffered from the disadvantage of nonselectivity. See DX 79 at 8. Merck began marketing cyclobenzaprine in 1977 for relief of "skeletal muscle spasm of local origin without interfering with muscle function." DX 10. Since that time, sales of the drug have reached approximately $400 million. Tr. at 1002–03 (Blake). Total sales for the year 1987 were $95 million. By Merck's calculations, FLEXERIL leads the muscle relaxant market, with a twenty-five percent share.[39] Tr. at 1010 (Blake). FLEXERIL's sales increased steadily each year since its entry into the muscle relaxant market. PX 283 at MF102021.

The muscle relaxant market is highly competitive. In 1984 the ratio of advertising expenditures to revenues was twenty percent. Tr. at 1005 (Blake). Merck's "promotion to purchases" ratio was only thirteen percent. Tr. at 1007 (Blake). Thus, although promotional expenditures on FLEXERIL in the first few years after its introduction were considerable, resulting in an almost one hundred percent promotion to purchases ratio, Tr. at 1035–36 (Blake), by 1981 FLEXERIL was the market leader. Tr. at 1009–10 (Blake). And in 1985, FLEXERIL outshone both the second and third place competitors combined. PX 283 at MF102028.

## II. CONCLUSIONS OF LAW

### A. Burden of Proof

■ Because of the presumption of validity accorded to each claim of Merck's patent under 35 U.S.C. § 282, Danbury bears the burden of proof with respect to the charged invalidity and unenforceability

of the patent by clear and convincing evidence. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *see Datascope Corp. v. SMEC, Inc.*, 594 F.Supp. 1306 (D.N.J.1984); *modified*, 776 F.2d 320 (Fed.Cir.1985). Pursuant to 35 U.S.C. § 282 (1982), a patent is accorded a presumption of validity, and the burden of proof to the contrary rests on "the party asserting such invalidity." *Id.* Therefore, Danbury bears the burden of proof of invalidity and of unenforceability.

### B. Obviousness: 35 U.S.C. § 103

■ Obviousness is a question of law. *See Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566–68 (Fed. Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Section 103 instructs that an invention otherwise patentable will not be entitled to a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103 (1982). The 1984 amendment to this section states:

> Patentability shall not be negatived by the manner in which the invention was made. Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

35 U.S.C. § 103 (Supp. IV 1986).[40] It is important to note that the language of section 103 requires evaluation of obviousness from the perspective of a person of

---

**39.** The accuracy of this figure is uncertain, because it depends on certain unverified assumptions of how much VALIUM is sold for tranquilizing use as opposed to muscle relaxant use. Tr. at 1018–19 (Blake).

**40.** The parties dispute whether Merck's preclinical reports from the 1950s qualify as prior art under the amendment. The Court, however, has not relied on the preclinical studies as prior art.

ordinary skill in the art at the time the invention was made. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed. Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). As the Federal Circuit recently explained:

> The consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art. Both the suggestion and the expectation of success must be founded in the prior art, not in the applicant's disclosure.

*In Re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir.1988) (citations omitted).

 Thus, the governing standard is emphatically not whether a particular method or process leading to an invention would be "obvious to try," *In Re Fine*, 837 F.2d 1071, 1075 (Fed. Cir.1988), but whether such an experiment would have been expected to succeed. *In Re Merck*, 800 F.2d 1091, 1097 (Fed. Cir.1986). Moreover, this expectation must be measured with deliberate avoidance of hindsight assessment. *Id.* However, the standard does not require "absolute predictability." *Id.* "Only a reasonable expectation that the beneficial result will be achieved is necessary to show obviousness." *Id.*

In route to the determination of obviousness, the Court must make the following factual findings set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

(i) the prior art's scope and content;

(ii) the difference between the prior art and the challenged claims;

(iii) the level of ordinary skill in the art then existing;

(iv) objective, i.e., secondary, evidence of nonobviousness.

*See Akzo N.V. v. United States International Trade Comm'n*, 808 F.2d 1471, 1480 (Fed. Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *see also Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed. Cir.1988).

### 1. The Scope and Content of the Prior Art

The prior art has been extensively discussed in *infra*, at Part I, section D of the Opinion. The most crucial aspect of the scope and substance of the art is the lack of suggestion of selectivity of either cyclobenzaprine or amitriptyline. The most the Sinha articles do is suggest the possibly significant muscle relaxant properties of amitriptyline. The Court agrees with the defendant that the Sinha article would have created an expectation in one of ordinary skill in the art that both amitriptyline and cyclobenzaprine would display some beneficial muscle relaxant properties. This carries the inquiry less far, however, than the defendant contends.

The plaintiff urges that Sinha must be entirely disregarded due to its allegedly significant flaws. The evidence shows, nevertheless, that Sinha was regarded by Engelhardt as worthy of citation in his chapter on muscle relaxants. Additionally, Gleason, Rooney, and Arther, all acted as if Sinha were worthy of consideration. Even if Merck's restrictive definition of the class of persons of ordinary skill in the art is accepted, leaving only Share and Smith as relevant skilled persons, the objective evidence is that the muscle relaxant program headed by Share followed up on Sinha's recommendations.

### 2. The Difference Between the Prior Art and the Challenged Claims

 Given the selectivity of cyclobenzaprine, albeit restricted, the test of the scope and content of the prior art in the instant case must be whether the reasonable expectation of cyclobenzaprine's selectivity is taught. Nowhere in the prior art does this suggestion arise, and the defendant does not assert anything to the contrary. Rather, Danbury rests its obviousness theories on the assertion that cyclobenzaprine is not selective, because of its drowsiness side effects. Consequently, the Court concludes that the substance of the prior art, taken as a whole, does not generate a reasonable expectation that cyclobenzaprine would behave as it does: selectively reduc-

**30**

ing abnormal muscle tone without causing muscle weakness.

### 3. The Level of Ordinary Skill in the Art

■ Merck defines a person of ordinary skill in the art for these purposes as an individual possessing a doctoral degree in pharmacology and special training or experience in the area of neuropharmacology, including the "design, execution, implementation and interpretation" of clinical tests or experiments. Tr. at 835 (Smith). Danbury apparently substantially agrees, *see* Tr. at 220 (Van Woert), although Van Woert did not include in his definition of the level of ordinary skill in the art the requirement that the individual have special training or clinical experience.

The Federal Circuit's guidance in this area may be found in *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). That decision lists the factors pertinent to ascertaining the theoretical ordinary level of skill in the art. They are:

(i) the inventor's educational background;

(ii) the kinds of problems confronted in the art;

(iii) solutions found previously;

(iv) the speed of innovation in the art;

(v) the level of sophistication of the technology; and

(vi) the educational level of active workers in the field.

*Id.* at 696; *see also, Afros S.P.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1417 (D.Del.1987), *aff'd*, 848 F.2d 1244 (Fed.Cir.1988). In *Afros*, this Court noted that *Environmental Designs* instructs that "some factors may predominate in relation to a particular field. [*Environmental Designs*] at 696–97." *Afros*, 671 F.Supp. at 1417–18:

The finding on ordinary skill in the art protects the integrity of the law of patents by focusing the Court's attention away from a hindsight analysis and toward the state of the art prior to the issuance of the patent "[A] person of

ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate...." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 455 (Fed. Cir. 1985).

*Id.* at 1418.

Applying the factors to the present controversy, the Court finds Merck's proposed definition acceptable. Defining the area of art as skeletal muscle relaxants, and noting the importance of some degree of clinical or experimental seasoning to an understanding of the pace of development and sticking points of the art, setting the ordinary skill benchmark at one with experiential as well as academic knowledge strikes the Court as most in keeping with the instruction of *Environmental Designs*.

### 4. Secondary Factors

*Graham v. John Deere* enumerates three examples of useful "secondary considerations" in determining obviousness: "commercial success, long felt but unsolved needs, [and] failure of others." *Id.*, 383 U.S. at 17, 86 S.Ct. at 693. Only the first factor is contested by Danbury, the latter two are admittedly present.

■ The commercial success—from a pecuniary standpoint—of FLEXERIL is undisputed. What Danbury contests is the existence of "a nexus between the claimed invention and the evidence of alleged commercial success." Defendant Danbury's Post Trial Brief, at 22 (Dkt. 61). Such a nexus is required before a court may consider the sales achievements of a product to be indicative of nonobviousness. *See Akzo N.V. v. United States International Trade Commission*, 808 F.2d at 1481.

If such a nexus exists, however, there can be no doubt that the *Graham v. John Deere* "secondary" factors in actuality are of considerable significance in determining obviousness. *See Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026 (Fed.Cir.1985); *Afros*, 671 F.Supp. at 1418. With these thoughts in mind, the objective evidence of nonobviousness may be more meticulously measured.

Merck responds to Danbury's charge that there is no nexus between FLEXERIL's commercial success and the Share claims by pointing out that while Danbury supports its charge by emphasizing the amount spent to advertise FLEXERIL, "[i]n fact, Merck spends less on advertising per total amount of purchases than *any* of its competitors." Post–Trial Brief of Plaintiff Merck & Co., Inc., at 50–51 (Dkt. 64); PX 283 at MF102019. The cited record authority relates to the year 1984 only. However, sales of FLEXERIL have continued to rise. Tr. at 1009 (Blake). It became and has remained the market leader. *Id.* This is evidence sufficient to support, under the circumstances, a finding of the nexus required in *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). *See Cable General*, 770 F.2d at 1026 ("substantial share of any definable market" relevant to determination of commercial success). Danbury's argument that FLEXERIL has not enjoyed commercial success is without merit.

### 5. In Re Merck

The Court of Appeals for the Federal Circuit's decision in *In Re Merck*, 800 F.2d 1091 (Fed.Cir.1986), is worth protracted attention here for several reasons. In particular, the *Merck* decision's exposition of the obviousness question presented by the close relationship of amitriptyline to imipramine bears a plain resemblance to the instant case.

The patent at issue in *Merck* claimed "a method of treating human mental disorders." *Merck*, 800 F.2d at 1092. The claims of the method, treating depression through the oral administration of amitriptyline, were rejected by the examiner as both anticipated (lacking novelty) and obvious. *Id.* The Board of Patent Appeals affirmed the examiner's decision with respect to the section 103 rejection, but reversed the section 102 rejection, finding that the patent was entitled to a filing date previous to the references found by the examiner to support the novelty rejection. *Id.*

In *Merck*'s description of prima facie obviousness, the court lays out the pertinent standard:

> To show obviousness, it was necessary to determine from knowledge already available in the art at the time of appellant's invention that one skilled in the medicinal chemical art would have expected amitriptyline, like imipramine, to be useful in the treatment of depression in humans. *In re Papesch*, 315 F.2d 381 (C.C.P.A. 1963).

*Id.* at 1096. The prior art references relied upon by the Board included several reports revealing test results "comparing the pharmacological properties of amitriptyline and imipramine." *Id.* at 1095. The properties of the two compounds were similar, "including their action as tranquilizers having narcosis-potentiating effects." *Id.* The Roche scientists resolved that "amitriptyline should be clinically tested for depression alleviation—a known property of imipramine." *Id.* at 1096.

Applying the standard to the amitriptyline method, the court looked carefully at the Roche reports, which "expressly stated that amitriptyline was expected to resemble imipramine clinically in its depression alleviation effects." *Id.* The Board had relied principally on the structural similarity of the two compounds and the technique of "bioisosteric replacement." Bioisosteric replacement involves "the substitution of one atom or group of atoms for another atom or group of atoms having similar size, shape and electron density" in order to produce "molecules having the same type of biological activity." The Board reasoned that "in attempting to predict the biological activities of a drug, a skilled medicinal chemist would not proceed randomly, but would base his attempts on the available knowledge of prior research techniques, and literature used in his field." *Id.* Bioisosterism is employed by medicinal chemists (and was prior to 1959) as a predictive technique for drug activity. *Id.* The Board found that this technique would have been known to one of ordinary skill in the pertinent art. *Id.*

The *Merck* court turned next to the appellant's argument that "the Board's decision was based on an impermissible 'obvious to try' standard." *Id.* at 1097. The standard of section 103 is not "obvious to try," *see In re Antonie*, 559 F.2d 618, 620 (C.C.P.A. 1977), but rather is "whether the references, taken as a whole, would have suggested appellant's invention to one of ordinary skill in the medicinal chemical arts at the time the invention was made." *Id.* The court found that the combination of the structural similarity between imipramine and amitriptyline, the fact that both were known psychotropic drugs, and

> the prior art teaching that the precise structural difference between amitriptyline and imipramine involves a known bioisosteric replacement provides a sufficient basis for the required expectation of success, without resort to hindsight. Obviousness does not require absolute predictability. Only a reasonable expectation that the beneficial result will be achieved is necessary to show obviousness.

*Id.* (citations and footnote omitted).

The next portion of the court's analysis dealt with the appellant's contention that the prima facie case of obviousness was rebutted by "evidence of unexpected results." *Id.* at 1098.

> [W]e are persuaded that the Board did not err in determining that the alleged unexpected properties of amitriptyline are not so unexpectedly different from the properties of imipramine ... as to overcome the prima facie showing of obviousness. The prior art of record clearly taught that amitriptyline was a known sedative. The evidence before us ... further revealed that all tricyclic antidepressant drugs, in general, possess the secondary properties of sedative and anticholinergic effects.... Thus, it appears that the alleged difference in properties between amitriptyline and imipramine is a matter of degree rather than kind. Moreover, as to the sedative effects, the [prior art] revealed only a slight difference between the two compounds. Amitriptyline was characterized as "highly sedative" while imipramine

was only "somewhat less [sedative] than amitriptyline." Regarding the anticholinergic effect, ... both drugs have anticholinergic effects but to a different degree. These are not truly unexpected results....

> The core of it is that, while there are some differences in degree between the properties of amitriptyline and imipramine, the compounds expectedly have the same type of biological activity.... As noted by the Board, a difference in structure, although slight, would have been expected to produce some difference in activity.

*Id.* at 1098–99.

Like the prior art relating to cyclobenzaprine and amitriptyline, the Roche reports explicitly stated that amitriptyline was expected to have an effect resembling imipramine. *See Merck*, 800 F.2d at 1095. Yet the gist of prior art references in *Merck* appears to be that amitriptyline was already known to have central nervous system effects, that imipramine was a known highly effective antidepressant, and that amitriptyline's expected resemblance to imipramine was expressly stated. The difference in the present case is that cyclobenzaprine *is* distinct from previously known compounds in its selectivity. Even if amitriptyline is a selective skeletal muscle relaxant of the class of cyclobenzaprine, no suggestion existed in the art that either would be *selective* in action. Therefore, unlike *In Re Merck*, the instant dispute concerns the relationship between two compounds with truly unexpected properties. That is, the facts are not squarely on point: amitriptyline (assuming it is selective) was not known in the art as a selective muscle relaxant. Selectivity is simply not foreshadowed in the art, much less strongly suggested.

### C. *Inequitable Conduct*

The next issue presented is whether Merck's actions in the course of the prosecution of the '246 patent violated the strictures of the inequitable conduct doctrine. Danbury's claims of inequitable conduct are two: (1) that Merck deliberately and

with the bad faith intent to mislead the PTO omitted data and prior art regarding amitriptyline; and (2) that Merck intentionally misrepresented cyclobenzaprine's activity by claiming that the compound did not produce certain side effects when Merck knew those side effects were characteristic of cyclobenzaprine. Merck contends that neither charge is true and that the evidence in the record contradicts Danbury's accusations.

*FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411 (Fed.Cir.1987) offers a cogent delineation of the elements necessary for an infringer to accomplish proof of inequitable conduct:

> "Inequitable conduct" is not, or should not be, a magic incantation to be asserted against every patentee.... To be guilty of inequitable conduct, one must have intended to act inequitably. Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO. That proof may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that applicant did not know of that art or information; (c) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (d) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.
>
> Thus, a balancing of overlapping considerations is involved in determining, in view of all the circumstances, the presence or absence of inequitable conduct. The level of materiality may be high or low. Applicant must be chargeable with knowledge of the existence of the prior art or information, for it is impossible to disclose the unknown.... Similarly, an applicant must be chargeable with knowledge of the materiality of the art or information ... [or] it may be found that the applicant "should have known" of that materiality.

*Id.* at 1415 (footnotes and citation omitted). *FMC* makes it unambiguous that the two *Lex Tex* inequitable conduct factors, materiality and intent, *see J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), must be evaluated as part of an overall investigation of the total mix of circumstances in deciding the existence or absence of inequitable conduct.

 The materiality of omissions or misrepresentations is determined by whether a reasonable PTO examiner would regard the information as consequential in deciding to allow the patent. *See Akzo*, 808 F.2d at 1481. Merck declares that its omissions were immaterial and that it made no misrepresentations. Specifically, Merck insists that Danbury has failed to demonstrate that "anyone involved in the prosecution of the '246 patent applications either believed that the Sinha publications were material or intended to mislead the PTO." Dkt. 64 at 60–61 (footnote omitted). Merck also rests its justification for the lack of citation of amitriptyline prior art on a characterization of the Lance 1964 publication as not pertinent to muscle relaxant activity.

 Preliminarily, the Court regards Merck's protestations concerning the lack of belief in Sinha's materiality on the part of Merck personnel as considerably beside the point. The question of materiality is not met by testimonials of subjective good faith. Instead, materiality is assessed from the point of view of the examiner. It is strange that Merck disputes the materiality of amitriptyline to the cyclobenzaprine patent application, in light of Merck's explanation for the inclusion of the amitriptyline data in its FDA submissions. As recounted above, Merck's version of the reason for the disparity in what the FDA received and what the PTO received was that amitriptyline was only included because Merck management felt that the

FDA would not accept that cyclobenzaprine had uniquely useful properties as a muscle relaxant without confirmation of the claimed distinctiveness through comparisons with amitriptyline.

 Merck's position on the FDA/PTO discrepancies raises several disturbing questions. First, Merck's explanation of why it presented matters to the FDA but withheld the same information from the PTO simply strains credulity. Merck professes that the information contained in the IND and NDA showed cyclobenzaprine's uniqueness. A close look at the FDA submissions exposes the flaws in this interpretation. The FDA submissions support Danbury's position, that amitriptyline and cyclobenzaprine share similar pharmacological properties.

Second, Merck's stance on the immateriality of amitriptyline also is untenable in light of the evidence. "There are no known product candidates in research which are likely to have the unique activity of MK–130 and amitriptyline. At least 150 tricyclic compounds have been evaluated in Dr. Share's laboratory; only MK–130 and amitriptyline show promise as muscle relaxants." DX 57 at MF093713 (Minutes of Special Meeting on MK–130 (October 1970)). Share was present at the meeting. Id. at MF093712.

The 1970 IND contrasts the effectiveness of cyclobenzaprine and amitriptyline to that of chlorpromazine and diazepam, concluding that, in contrast to the latter two compounds, "both MK–130 and amitriptyline may have a more specific action on the hyperactivity of skeletal motor systems in mice." DX 18 at MF093312. In another study reported in the IND, it was noted that:

> [c]omparative studies with amitriptyline, chlorpromazine and diazepam indicate that, while amitriptyline is approximately equipotent to MK–130, both chlorpromazine and diazepam are considerably more potent.... However, both chlorpromazine and diazepam exhibited marked sedative properties at effective blocking doses.... This contrasts with the activity of MK–130 and amitriptyline.... These

results suggest that MK–130 and amitriptyline may be more specific in their ability to reduce skeletal muscle hyperactivity in mice.

Id. at MF093327. The examples quoted above are by no means the only instances of parallels drawn between cyclobenzaprine and amitriptyline in the 1970 IND.

Merck maintains that the information regarding amitriptyline's activity was included in the IND solely because the FDA "would request a comparison because the chemical analogs are so close that they would be hard pressed to believe that there was this unique difference." Tr. at 452 (Share). Such an argument for inclusion may be made just as plausibly in the context of a patent prosecution.

There is no question that Share knew of the Sinha publication. He professes to have disregarded it completely, and in keeping with his belief that amitriptyline was not a muscle relaxant (a belief which is frankly incredible in light of the IND disclosures prepared in part by Share) he did not bring it to the attention of Arther, the patent agent. However, Arther himself was aware of the Sinha publications and their significance with regard to the patentability of amitriptyline as a muscle relaxant. He was also aware of the results of the in-depth evaluation of cyclobenzaprine presented in March 1972, which included information on cyclobenzaprine's significant drowsiness side effects. DX 70. Additionally, Rooney, the chemist who replaced Gleason as head of the muscle relaxant program, wrote the following note on a copy of Sinha:

> This is literature art which might be quoted against patent applications in the tricyclic series for muscle relaxation. Fortunately, cyclobenzaprine is not mentioned.

DX 95 at MF089694.

Share published an article in 1975, while the patent application was still pending, on the use of cyclobenzaprine as a skeletal muscle relaxant. DX 99. The article compared cyclobenzaprine to two standard muscle relaxants, chlorpromazine and diazepam. Id. Testimony at trial established

that the data included in the publication were identical to data from an earlier study comparing *four* compounds: cyclobenzaprine, amitriptyline, chlorpromazine, and diazepam. The earlier study appeared in Merck's first IND and in the report Share formulated in preparation for the IND. DX 18, 53. Stuart, Merck's director of research, who occasionally took notes at meetings he attended, made some undated handwritten notes which seem to have been contemporaneous with a June 20, 1974 meeting at which Share's publication was discussed. The notes read: "cyclobenzaprine publication (amitriptyline out of manuscript)." DX 100, 101.

Cyclobenzaprine's uniqueness in producing muscle relaxation without ataxia was increasingly the focus of Merck's amendments and c-i-p applications. In the 1973 c-i-p, Merck stated that cyclobenzaprine was unique in its selectivity. This was not entirely accurate, because by October 1970, the relevant personnel at Merck knew that amitriptyline's activity was comparable to cyclobenzaprine's, even in the ischemic cord rigidity model when given orally (in which amitriptyline had fared less well than cyclobenzaprine when the drugs were injected). DX 56 (October 1970 Muscle Program Review, at which Rooney, Gleason, and Share, among others, were present). At the same meeting,

> It was pointed out that a publication in the Japanese Journal of Pharmacology several years ago, which claimed that amitriptyline has muscle relaxant properties will probably preclude obtaining use patent on this compound.

DX 57 at MF093716.

Equally disturbing is Merck's blatant misrepresentation of the side effects of cyclobenzaprine in response to the examiner's reluctance (to put it mildly) to allow the claims. Merck unquestionably knew of cyclobenzaprine's tendency to induce drowsiness at the time of the June 1972 amendment which claimed the opposite.[41] The

record is replete with references to the drowsiness side effects of cyclobenzaprine. The incidence of drowsiness in patients tested with cyclobenzaprine's was reported at the November 1972 in-depth review,[42] and was known to Merck as a result of the initial clinical trials of the late 1950s.[43] Yet the June 1972 amendment describes cyclobenzaprine's action as free of "the attendant side effect of depression or causing muscle weakness and drowsiness." This is, in the Court's view, highly misleading, and most certainly material.

Applying the *FMC* factors results in the following picture: (i) Merck withheld material prior art information concerning amitriptyline and misrepresented cyclobenzaprine's selectivity in response to the examiner's objections to allowing the claims; (ii) the persons responsible for the patent prosecution, Arther and Share, admittedly knew of the omitted information and of its materiality; (iii) damning evidence in the form of documents and chains of events that the omissions and misrepresentation were intended to mislead the PTO. Merck has failed to overcome this proof: (a) the information concerning amitriptyline's usefulness as a muscle relaxant, and the knowledge of the drowsiness side effect, comprising both omissions and misrepresentations, was not merely cumulative; (b) relevant personnel at Merck did know of the art omitted; (c) likewise, these persons knew of the high degree of materiality of the omissions and misrepresentations; and (d) the only showing Merck has made on its purported lack of intent to mislead the PTO is unconvincing protestations of subjective good faith.

#### D. *Section 112*

 Danbury's third major attack on the '246 patent is based on 35 U.S.C. § 112 (1982). That section sets forth guidelines regarding the specification detailing the invention. In order to be entitled to the May

---

**41.** Merck attempts to explain away this misrepresentation by arguing that the statement "was written in the conjunctive, and, when properly read as written, is true." Dkt. 64 at 64. The Court is unpersuaded by this semantic ploy.

**42.** DX 71 at MF003372; DX 72 at MF097312.

**43.** DX 19 at MF093046.

21, 1971 filing date of the original United States application, Merck's description therein must have depicted the "manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same.... The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.* Because the initial application did not contain the precise language appearing in Claim One of the January 1973 c-i-p, Danbury argues that the prior filing date is unavailable to Merck, and that the publication of the Molina–Negro study thus anticipates the invention and it is not patentable.

The applicable standard is whether "the written description ... communicate[s] that which is needed to enable the skilled artisan to make and use the claimed invention." *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1421 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1735, 100 L.Ed.2d 198 (1988). That standard has been met by Merck here. The initial application states that cyclobenzaprine is "unusually specific" in its activity, a statement which when construed reasonably supports the selectivity claimed in the later applications. *See Acme Highway Products Corp. v. D.S. Brown Co.*, 431 F.2d 1074, 1080 (6th Cir.1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971).

■■■ The second aspect of Danbury's section 112 claim [44] is that Merck's patent fails because it includes inoperative embodiments. For example, cyclobenzaprine is deemed not useful in treating spasticity, but that use is claimed in the patent.

Merck suggests that the determination that cyclobenzaprine is not clinically useful in treating spasticity was not what it appeared to be. Because the results of the trials were mixed, and because correctly defining the patient population to include only individuals with hypertonic (as opposed to hyperphasic) disorders is difficult, Merck declares that in fact, cyclobenzaprine *is* effective in treating spasticity in some cases.

The Court is willing to accept Merck's contentions on this point. Notably, a section 112 inquiry of this type is distinct from determining inequitable conduct. Also important is the maxim that a claimed invention need not be unerringly effective in its operations: all that is required is usefulness in some instances. *See Freedman v. Overseas Scientific Corp.*, 248 F.2d 274, 276 (2d Cir.1957).

### E. *Attorney Fees*

In section C, *supra,* the Court held Danbury had established by clear and convincing evidence that Merck engaged in inequitable conduct before the PTO. The factual findings and legal conclusions set forth with respect to Merck's inequitable conduct before the PTO are incorporated by reference and will only be summarized and not repeated in discussion of the attorney fees issue.

35 U.S.C. § 285 governs the award of attorney fees:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

35 U.S.C. § 285 (1982).

■■■ A trial court must find a case "exceptional" before it may award attorney fees. The limitation of attorney fees to exceptional cases "is based on the premise that courts should attempt to strike a balance between the interest of the patentee in protecting his statutory rights and the interest of the public in confining such rights to their legal limits." *Machinery Corp. of America v. Gullfiber*, 774 F.2d 467, 471 (Fed.Cir.1985). In seeking the award of attorney fees, as in proving invalidity and unenforceability, Danbury must prove by clear and convincing evidence that this is an exceptional case. *Reactive Met-*

---

**44.** Danbury additionally argues that the '246 patent's claims were written to encompass inoperative uses because of the wide range of dosages claimed. This argument is without merit.

Merck's patent contains the proper limitation calling for administration of a "therapeutically effective and safe dosage of cyclobenzaprine." PX 200.

*als Alloys Corporation v. ESM Incorporated,* 769 F.2d 1578, 1582 (Fed.Cir.1985). In essence, Danbury must establish by clear and convincing evidence bad faith conduct by Merck during its prosecution of the '246 patent. Danbury has carried its burden.

A reasonable PTO Examiner would have regarded as crucial the withheld information about amitriptyline. Yet, Merck never mentioned amitriptyline to the Examiner. It engaged in a program which had as its goal the withholding from the PTO any knowledge of amitriptyline. Highlights of the withheld information, all known to Merck, are:

1. Amitriptyline and cyclobenzaprine were very similar in chemical structure, the only difference being the presence of a double bond in cyclobenzaprine.

2. Similarity of pharmacological properties of amitriptyline and cyclobenzaprine.

3. The Sinha publication revealed amitriptyline as a muscle relaxant. This publication was one of the two reasons Gleason cited for ordering the tryclicic samples which included cyclobenzaprine.

4. Merck's weak, unsatisfactory explanation of why amitriptyline was so material to the FDA (because the FDA would require it), but somehow immaterial to the contemporaneous patent application.

5. Withholding from the PTO of Merck's lab results and reports in the IND relating to similarity in pharmacology and the unique specific properties of amitriptyline and cyclobenzaprine to reduce skeletal hyperactivity.

6. The Share 1975 article omitted data reference to amitriptyline, although the data in the article is identical to earlier Share work which included the amitriptyline data. In conjunction with this unexplained deletion, there is Share's handwritten note indicating amitriptyline was not to be mentioned in the article.

Similarly, the PTO Examiner was critically misled by Merck's misrepresentations about selectivity, the very basis for grant of the patent. Merck correctly represented cyclobenzaprine was selective in that it reduced hypertonic muscle tone without loss of normal muscle tone. However, Merck repeatedly throughout its submissions assured the PTO Examiner that cyclobenzaprine had no sedative side affects. *See supra,* Part I, Section I. Leaving aside Merck's questionable distinction between sedation and drowsiness, Merck went so far as to assure the unsuspecting PTO Examiner on June 16, 1972 that cyclobenzaprine was "without the attendant side effect of ... drowsiness." DX 79 at 45. Yet in March 1972 the Merck review minutes of the Aiken and Oats results disclosed "side effects of ... drowsiness." DX 71 at MF003366–68. Worse, in November 1972 Merck noted "[T]he side effects, drowsiness, dry mouth and bad taste are significantly more frequent in the MK–130 (cyclobenzaprine group) ... and will be the ones most commonly seen when the drug is used in outpatients." DX 72 at MF097312. All of the information about drowsiness was noted by Merck in its submissions to the FDA, resulting in the FDA requirement that the FLEXERIL package insert note that the most frequent effect is drowsiness. DX 10 at MF067607.

From the above summarized facts and additional facts found in the Findings of Fact, I conclude Merck's withholding of all information about amitriptyline and misrepresentation with respect to drowsiness was in bad faith and with the intent to mislead, making this an exceptional case. Given the flagrant inequitable conduct by Merck before the PTO, it would be unjust not to award Danbury reasonable attorney fees. Accordingly, attorney fees will be awarded.

## III. CONCLUSION

The Court has found the '246 to be valid in that Danbury failed to carry its burden and prove cyclobenzaprine was obvious or that the patent disclosure was violative of § 112. However, because of Merck's withholding all information about amitriptyline

**38**

and telling the PTO cyclobenzaprine did not cause drowsiness while its data was all to the contrary, the '246 patent has been held unenforceable because of inequitable conduct.

The parties shall confer and attempt to agree upon the amount of attorney fees and incorporate the same in an order to be presented by Danbury or notice within 10 days.